JEANETTE M. WATSON, petitioner, v. SHANNON B. CHARLTON, Judge of the Tenth Judicial District, respondent.

No. 47990.

(Reported in 50 N.W.2d 605)

DECEMBER 13, 1951.

82

Robert L. Larson, Attorney General, and Robert Buckmaster and Harris, Van Metre & Buckmaster, all of Waterloo, for respondent.

Ray R. Reed, of Waterloo, for petitioner.

THOMPSON, J.—For determination here is a certiorari proceeding in which the petitioner seeks to test the legality of the acts of the respondent, as judge of the district court of Iowa in and for Black Hawk County, in adjudging her guilty of contempt of court and sentencing her to confinement in the Women's Reformatory at Rockwell City for a period of six months. The propositions relied upon for reversal are that the respondent acted illegally, imposed excessive sentence, and exceeded the jurisdiction of the court. In determining whether any or all of these should be sustained, a statement of the facts is essential.

The respondent was the presiding judge at the trial of the case of State of Iowa v. Beckwith. The defendant therein was accused of the crime of murder; the case was of importance, and had attracted much attention because of the brutal nature of the acts charged as constituting the offense, and because it had been tried once previously, with the judgment of guilty and imposition of the death penalty having been reversed by this court. State v. Beckwith, 242 Iowa 228, 46 N.W.2d 20. All of this resulted in wide publicity and brought about a situation in which it was difficult to obtain qualified jurors. The trial commenced on May 14, 1951, and the panel of jurors regularly called was soon exhausted, making it necessary to call talesmen. The petitioner was one of the latter group. She was notified sometime after 10:20 a. m. on May 16 that her name had been drawn, and was required to report at 2 p. m. on the same date. She appeared accordingly, accompanied by her five-year-old son.

The petitioner at the time was thirty-eight years old, and was a housewife living in Waterloo with her husband and two small sons, one eight and the other five. Her husband was employed regularly, and there were no other members of the household. She had no one with whom to leave the children during her absence. The older boy was apparently in school during the day, but the younger attended kindergarten in the morning only. Petitioner testified that she had no one available or upon whom

she could call to care for the children if she were away. After her appearance in the courtroom on May 16, she was examined on voir dire sometime during the afternoon. At this time she told the prosecuting attorney that she had not had a "baby sitter" for nine months; that when she had one, it was in the evening; that they "just weren't available in the daytime." Counsel then remarked: "Maybe the court will help you find one." She replied: "All right." It is only fair to the respondent to say that upon oral argument in this court it was claimed that this statement was made facetiously, and was so understood by petitioner. We are unable to determine this from the printed record. It should also be said that petitioner did not request an excuse from jury service.

Upon examination by defense counsel, the petitioner again, in answer to the usual question as to whether there was anything not specifically inquired into which might show that she "could not and should not sit as a juror in this case", referred to her family situation. She said: "The only thing is the family. Who will feed the family and take care of the family? My family?" She was not challenged for cause, and shortly after 11 a. m. on the next day, May 17, was selected as one of the twelve jurors to try the case.

Thereupon, the clerk of the court directed the jurors to stand and be sworn. The petitioner then said: "I cannot take the oath." Upon being advised that she might affirm, she said: "I won't do either. I don't want to do either." Further: "What do I do with my children? They are coming home at 11:30. They are going to roam around there. I don't have anybody to take care of them. And you talk about juvenile delinquency! I take care of my children."

Prior to the direction to the chosen jurors to take the oath there had been no announcement that they would be segregated during the trial. At that time, however, they were so advised by the court. Upon Mrs. Watson's refusal to be sworn, the respondent took her into his chambers, advised her of her duty to serve, told her that if she persisted in her attitude it would be necessary for him to put her in jail for contempt, and about 12 M told her that she might go home, returning at 2:30 p. m. He advised her to take the matter up with her husband and to see an

attorney during the recess, and to make necessary arrangements for the care of her children. She went home, prepared lunch for her family, was advised by her husband to serve, called an attorney, who was unable to see her, but did tell her via the telephone that she would probably be compelled to serve, found no one to stay with the children, and returned to the courtroom at 2:30 p. m. as directed.

At this time, the jury being again ordered to stand and take the oath, petitioner at once said: "First of all I have to have someone to take care of my children before I can take the oath. I have no one to take care of them." Respondent then said: "Is the court to understand, Mrs. Watson, that you refuse to take the oath?"; to which petitioner replied: "I'll have to. I don't know what to do with them. I'm sorry, sir." Here respondent ordered petitioner to take the witness chair, where the voir dire oath was administered to her. After eliciting her name, and the fact that she had appeared for examination as a prospective juror, respondent asked: "Without ever having made any application for excuse from jury service?" Petitioner answered: "I didn't know that you could do that. I had never had any dealings with any legal matters." She then admitted her refusal to be sworn, and that the court had advised her, at noon, to consult an attorney. Respondent then sentenced her, in these terms:

"Defendant before the court for contempt in that she refused to take an oath as juror in the case of State of Iowa versus Edward James Beckwith, in which she had been duly selected as a juror. Defendant examined in open court. Defendant found guilty of contempt and sentenced to be confined in the Women's Reformatory at Rockwell City, Iowa, for the period of six months. Mittimus to issue forthwith."

At this point William E. Watson, petitioner's husband, appeared, was sworn, and said that he had "tried to talk her into serving"; but he also said that he could not take care of the two children, but that he would "go out of my way to hire somebody." Respondent replied that she had "never brought up this matter in regard to the children until after she had been selected and until after she had been directed to assume her place in the jury box and to assume her duties as such." Here petitioner spoke up,

saying that she had told of the children upon her examination, that she had said she had no one to care for them; that she had had insufficient time to find anyone; that her husband had to make the family living, but perhaps he could go home and stay with the children and she would serve if the sentence were "taken back." To this, respondent's only reply was: "Your exception has been noted, and bond on appeal fixed in the sum of $1,000."

Within perhaps fifteen to thirty minutes after this, an attorney representing Mrs. Watson appeared in the courtroom and asked that she be heard in an effort to purge herself of any contempt. The court agreed to hear her, stipulating that it was agreeable to counsel for both the State and defendant that he do so. Counsel were allowed to dictate into the record certain interrogatories which the court was to ask petitioner concerning her attitude of fairness to the opposing parties in case she should purge herself of contempt and be permitted to serve. Upon interrogation by her own counsel petitioner then said that it was not her intention to refuse to serve under any circumstances; that she was thinking of her children and would have been willing to serve if someone could be found to care for them; that her husband's employer had now agreed that Mr. Watson might stay home with the children, without loss of pay. She then said that she was ready to serve upon the jury, to take the oath, and that she could and would serve fairly; that the trouble she had had would in no manner influence or prejudice her for or against either party.

At this point the court, before ruling upon her effort to purge herself, called the attorneys for the State and defense into his chambers and asked them if they were willing that Mrs. Watson should serve if purged of contempt. Counsel for the State agreed to accept her, but defense counsel would not. In this connection, in an "Amendment to Record" in affidavit form, filed herein by respondent, we are told that when Attorney Ray R. Reed, for petitioner, told respondent that arrangements had been made to care for the children and that she was willing to serve and desired an opportunity to purge herself of contempt, that he, respondent, advised Mr. Reed *"the situation created by Mrs. Watson's refusal to take the oath was beyond the exclusive con-*

*trol and power of the court to correct, as she could not, in fairness to the other eleven jurors, be permitted to purge herself unless she could and did sit on the jury."* Respondent says that he then suggested to petitioner's counsel that he confer with the attorneys in the principal case, to determine the possibility of Mrs. Watson sitting on the jury, which would *"of necessity depend upon whether or not either or both of such parties made objection to her doing so."*

Following the refusal of the defense to accept petitioner as a member of the trial jury, the court made an order finding that she had not purged herself of contempt, and affirming the prior order of commitment, except for that part of it fixing bond, which respondent found that he had no power to make. Petitioner was taken ·to the Black Hawk County jail to be held until the convenience of the sheriff permitted him to transfer her to the Women's Reformatory; but after she had been there imprisoned about twenty-six hours a stay order from this court directed her release pending hearing upon her application for review by certiorari.

I. The petitioner's first, and perhaps most emphasized, complaint concerns the failure of the respondent to give her an opportunity to explain her conduct in writing before judgment and sentence. Section 665.7, Code of 1950, has been in effect under different numbers in different Codes for many years. It is here set out:

"Before punishing for contempt, unless the offender is already in the presence of the court, he must be served personally with a rule to show cause against the punishment, and a reasonable time given him therefor; or he may be brought before the court forthwith, or on a given day, by warrant, if necessary. *In either case he may, at his option, make a written explanation of his conduct under oath, which must be filed and preserved."* (Italics supplied.)

It is evident that in the case at bar the petitioner had no opportunity to exercise the right given her by the italicized portion of the foregoing statute. She was summarily found guilty of contempt and sentenced. Nor does respondent contend otherwise. His argument is that petitioner waived her right to

explain in writing, or that her refusal was so flat and definite that she had nothing which could have been satisfactorily explained, and so any permission given her by the court to attempt to explain or justify would have been a useless gesture. An examination of the authorities bearing upon the question is called for here. The statute above-quoted has been considered by this court in six different cases. The first of these was State v. Duffy, 15 Iowa 425, 427. Here the defendant asked, and was refused, permission to file a written statement before judgment. He was adjudged guilty of contempt. The next day he filed his written explanation of his conduct. Upon appeal, we said:

"There is no authority for refusing to receive the explanation, where it is proposed to make it, and the party should have a reasonable time to prepare the same. In this case it seems a short time was asked; that the request was refused, and the commitment at once made. This was certainly erroneous."

However, the written statement filed after judgment of contempt set up only one ground of excuse or defense, and it was held that as a matter of law it was insufficient, so that even if filed before the adjudication it would have availed nothing. The finding of contempt was affirmed.

Russell v. French, 67 Iowa 102, 105, 106, 24 N.W. 741, 743, is next in chronological order. It is probably the leading case in Iowa upon the point involved. The petitioner there was an attorney who was adjudged guilty of contempt because of the alleged use of insulting language to the court. The judgment was set aside by the supreme court. After pointing out that the common-law rule did not give an alleged offender the right to explain his conduct except with the permission of the court, and that it was the evident purpose of the statute to change the rule for the benefit of the accused contemnor, the opinion says:

"The court adjudged the defendant guilty and inflicted punishment, so to speak, in the same breath. There was no time when he could have exercised the right given him by statute. The right is not a barren one, but is of a substantial character, and a person cannot be deprived of it by an expeditious mode of inflicting punishment. We cannot but think that, when a court deems that a contempt of its authority has been committed, the

attention of the accused should be called thereto, and a reasonable time fixed within which he may make the written explanation contemplated by the statute."

In Hardin v. Silvari, 114 Iowa 157, 159, 86 N.W. 223, 224, the petitioner had been found guilty of insolent and contemptuous conduct toward the court, and adjudged guilty of contempt without being given an opportunity to file his explanation in writing. The short opinion of this court held that "in unmistakable language he [petitioner] advised the court that he was ready for punishment if the judge was disposed to inflict it. This clearly amounted to a waiver of the right to be heard in explanation or excuse of his conduct * * *."

The Hardin case, supra, was followed by State ex rel. Arthaud v. District Court, 124 Iowa 187, 189, 99 N.W. 712, 713. Here again the relator was an attorney who had been adjudged guilty of a contempt committed in the presence of the court. The judgment was annulled upon review in this court. Justice Weaver, for the court, said: "It is quite clearly the intent of the statute to allow the party the right to file such explanation before the assessment of punishment * * *. To assess punishment first, and allow explanation afterward, would be an entire reversal of the ordinary course of judicial proceedings."

Coyle v. Sawyer, 198 Iowa 1022, 1027, 200 N.W. 721, 723, holds that the right to make a written statement before judgment may be waived. Here again the contemnor was a lawyer, and this court said: "The conduct of the petitioner and the language used unmistakably indicate that he would not comply, and that he was ready to be punished for contempt, if his act was so considered by the trial judge. This in itself constituted a waiver of his right to be heard in further explanation or excuse of his conduct."

Finally we come to Harding v. McCullough, 236 Iowa 556, 562, 19 N.W.2d 613, 617. Since the opportunity to make written explanation had been given and exercised, the point was not directly involved, but we said:

"We have held that one charged with even a direct contempt, where the court acts upon personal knowledge, must be accorded the opportunity to make such explanation. State ex rel. Arthaud

v. District Court, 124 Iowa 187, 189, 99 N.W. 712; Russell v. French, supra, 67 Iowa 102, 105, 24 N.W. 741. Plaintiff was given reasonable opportunity to make written explanation of his conduct and filed such a writing." .

██ ██ The general principle which evolves from a study of the statute and the cases interpreting and applying it is clear. The right to make a written explanation or excuse is expressly granted; and no conviction should be had until reasonable opportunity has been given to the alleged contemnor to exercise it. The common law was to the contrary; and it is the manifest intent of the statute, which has existed in Iowa in substantially its present form almost since the formation of the state, to change the rule in order to avoid the harsh results formerly attendant upon summary proceedings in these matters. Code section 665.7, under its various numbers, has been consistently interpreted by this court in the past to give the accused a real and substantial right. It is true that in two cases—Hardin v. Silvari and Coyle v. Sawyer—both supra, in each of which the petitioner was a lawyer, we said that the contemnors had so clearly expressed their ultimate refusal to obey the court or to show proper respect for it, and had so definitely invited punishment, that they must be held to have waived their rights to make written showings.

. But we think that in the case at bar the situation is ruled by what we have said in Russell v. French, State ex rel. Arthaud v. District Court, and Harding v. McCullough, all supra. The petitioner here was a housewife and mother, with no experience in legal matters. If she was in error in placing her need to care for her two small children above her duty as a citizen to serve upon the jury when she had been legally selected, it was an error which many mothers would make. If we concede that she should have obeyed the order of the court, it must also be conceded that circumstances made it most difficult for her to do so. It is not for us to say whether she could, if given the opportunity, have made a satisfactory excuse, explanation, or justification for her refusal to take the oath. She might have shown, as the fact was, that she had little opportunity to ask for an excuse from jury duty, since she was drawn as a talesman at 10:20 a. m. and directed to report at 2 p. m.; and that she had no knowledge of

her right to ask such excuse, or time to learn thereof. She might have corrected the erroneous impression of the respondent that she had not mentioned her difficult family situation until directed to take the oath, by pointing out the record of her voir dire examination by each counsel in which she told them of her problem. Or she might have set forth other reasons, excuses, or explanations which would have removed the stigma of contempt. It was her right to attempt to do so; and we cannot say that her conduct was such that she can be held to have waived it. This right was denied her by the respondent, who summarily tried, convicted and sentenced her within the space of a few minutes—as we said in Russell v. French, supra, "in the same breath." We held, in the latter case, that when a court deems that a contempt has been committed, the attention of the accused should be called thereto and a reasonable time fixed within which he may make the written statement permitted by the statute. This rule should be most scrupulously applied when, as here, the suspected contemnor is without counsel, is inexperienced in legal affairs, and quite evidently has no knowledge of his rights. The respondent acted illegally in failing to give her the opportunity to file a written statement.

In so holding, we are not without understanding of the dilemma in which the petitioner's refusal to take the oath had placed the respondent. He was charged with the duty of presiding at a difficult and important trial, in which the defendant was accused of murder, and whose life was therefore at stake. Many decisions must be made daily, and made correctly. Under the situation existing in the case then being tried, finding a sufficient number of qualified jurors was a serious, although not unsolvable, problem. When a jury had apparently been selected, respondent was faced with an unexpected difficulty in the refusal of the petitioner to take the oath. Trial judges are often hurried, harried and harassed. But this does not affect the rights of the parties before him. It is an occupational hazard.

II. Were the illegality pointed out in Division I the only one appearing in the record, the question might arise as to whether we should not remand the case to the trial court for further proceedings; that is, whether we should not content ourselves with setting aside the judgment and returning the

cause with directions to permit petitioner to file her written statement, after which the district court would determine the problem of the alleged contempt. Under some circumstances, in certiorari, we are required to prescribe "the manner in which either party may proceed further." R. C. P. 316. It is the rule that certiorari proceedings may be remanded where the inferior tribunal has not proceeded according to law and the mistake may be corrected upon a further hearing. 14 C. J. S., section 181, pages 325, 326.

But we think there is another illegality which requires that our determination herein should be final. It is apparent on the face of the record, and it would make remand or any further proceedings in the trial court a useless gesture. There is no doubt that the record would be at least as strong for petitioner upon a further hearing. It is our duty to avoid prolonged and profitless litigation whenever possible. Nehring v. Smith, 243 Iowa 225, 49 N.W.2d 831.

While the matter is not stressed in argument by petitioner, under her assignment of error that respondent acted illegally, and for the reasons set out in the paragraph immediately preceding, we think it proper to comment upon this feature of the case. After petitioner had been adjudged guilty of contempt and sentenced, her attorney appeared and asked that she be permitted to attempt to purge herself. Respondent granted her this right. She thereupon, under oath, explained her situation somewhat more fully, said that her husband's employer had agreed that he might stay at home to care for the small boys, and that she was then willing to take the oath and serve upon the jury. But respondent took the attitude, as shown by his amendment to return filed herein, that he could not purge Mrs. Watson of contempt unless she could serve upon the jury; that it would not be fair to the other jurors. He, accordingly, referred the matter to the contesting attorneys for the State and defendant, to determine whether they were each willing to accept her as a member of the trial jury. The defendant being unwilling so to do, the respondent refused to hold that petitioner had purged herself.

It is apparent that in effect the respondent abdicated his own right and duty to determine the question of purging, and

delegated it to the attorneys in the principal case then on trial. We suggest that it was the willingness of the petitioner to serve, rather than the willingness of counsel to accept her, which should have been made the chief factor in the respondent's decision. He acted illegally in permitting his determination to rest upon the attitude of the attorneys.

■ It is said that a contemnor will generally be allowed to purge the contempt by performing the act required or by undoing or reversing the acts constituting the contempt. 17 C. J. S., Contempt, section 106, page 147. Likewise, if the alleged contemnor has done all in his power to obey the court's order he will usually be entitled to discharge, even if he is, through no present fault of his own, unable to comply. 17 C. J. S., section 108b, page 148.

■■ We have held that we will review the evidence upon certiorari questioning the legality of a judgment of contempt. The cause is not triable de novo, but, on the other hand, while much weight is given to the findings of fact by the trial court, we are not bound by them. The exact extent to which we may go in deciding questions of fact from the record is vaguely defined; it lies in a shadowland, a "twilight zone", whose boundaries do not admit of definite charting. Andreano v. Utterback, 202 Iowa 570, 210 N.W. 780; Schraeder v. Sears, 192 Iowa 604, 185 N.W. 110; McNiel v. Horan, 153 Iowa 630, 133 N.W. 1070; Roach v. Oliver, 215 Iowa 800, 244 N.W. 899. Each of these cases holds that we may review the facts upon which the judgment of contempt was founded; that they do not have the effect of the verdict of a jury. We have also said that "to warrant a conviction, the guilt of the accused must be established by clear and satisfactory evidence." Burtch v. Zeuch, 200 Iowa 49, 52, 202 N.W. 542, 39 A. L. R. 1349. Also: "Proceedings of this character are held in this state to be in their nature criminal, or quasi criminal, and a clear case of contempt must be shown by the evidence where it is required." Hobson v. District Court, 188 Iowa 1062, 1066, 177 N.W. 40; Crosby v. Clock, 208 Iowa 472, 478, 225 N.W. 954.

■ It is true that we are dealing, in this division, with the attempt of the petitioner to purge herself of contempt after she had been adjudged guilty. But we see no reason why the same rule should not apply to our right to review the evidence, to de-

termine whether the court acted illegally in refusing to hold that she had purged the contempt. In this case, we have pointed out that as a matter of fact she had not been legally adjudicated to be in contempt at the time of her effort to purge; and further, that the respondent in effect permitted the defendant's counsel to determine the effect of her attempt. It appears clearly, also, that so far as the respondent himself was concerned, he would have held that she had satisfactorily purged herself if she had been then accepted as a juror; else there was no point in submitting the matter to the attorneys. We agree with this interpretation of the facts, that is, that they show a sufficient purging. The respondent should have so held.

III.    Petitioner also assigns error upon what is claimed to be an excessive sentence. Since we have held in Division I that she was not found guilty of contempt by legal processes, and in Division II that if she had been so found she sufficiently purged herself, there is no necessity for determining the question of the degree of punishment. In passing, however, we think it proper to say that we agree with petitioner's contention. The sentence given—six months in the Women's Reformatory—was the maximum imprisonment permitted by the statute. The punishment was far out of proportion to the offense which respondent thought Mrs. Watson had committed.

IV.    It is urged upon behalf of respondent that whatever the decision may be upon the merits of this particular case we should not lose sight of the basic and most important responsibility of the citizen in discharging his duty of jury service. The attorney general of Iowa, appearing in oral argument for respondent, stressed this feature of the case. It goes without saying that in our determination of this cause we have no thought of encouraging or glorifying attempts to avoid jury service. No higher responsibility rests upon the citizen than that of taking his place on the jury panel, when called, without evasion or complaint. The law recognizes that some situations may arise in which an undue burden would be placed upon the prospective juror if compelled to serve, and so provides for excuses for proper cause. But justified complaint has been heard for some time past that many persons seek excuse from their clear duty for reasons connected only with their convenience, or distaste for

service. It occasionally, perhaps usually, happens that the citizen is put to considerable inconvenience or loss of income if he serves. But these are not reasons for seeking to evade his responsibility as a citizen of the republic.

Only the most compelling circumstances will direct the good citizen to ask an excuse when summoned to the jury panel; and the court should grant such a request, when made, only upon the best of grounds. Any other attitude on the part either of the juror or the court destroys the effectiveness of the jury system. The jury panel should represent a true cross section of the community instead of being composed solely of those who are serving merely because they have nothing better to do. Basically, jury service is a test of character and citizenship. If at all possible, the good citizen will not only serve willingly, when called, but will use his best efforts, intelligence and integrity in deciding the cases which are placed before him. Any lesser degree of understanding and performance makes a mockery of the long-established Anglo-Saxon jury system, and must eventually lead to a search for a better method of deciding legal controversies. It can function properly only with the fullest co-operation of all citizens; it must not be emasculated by selfish indifference.

For the reasons set out in Divisions I and II the writ of certiorari is sustained, the judgment finding petitioner guilty of contempt is annulled and she is discharged.—Writ sustained and petitioner discharged.

OLIVER, C. J., and BLISS, GARFIELD, WENNERSTRUM, MANTZ, MULRONEY, and HAYS, JJ., concur.