**SEASTRUNK RENDERING CO., Limited, et al. v. HOLLINGSWORTH et al.**

No. 9420.

Court of Civil Appeals of Texas. Austin.

Jan. 26, 1944.

Henry Taylor, of Temple, and W. L. Eason, of Waco, for appellants.

Lee Curtis and Arthur O'Connor, both of Belton, for appellees.

McCLENDON, Chief Justice.

The purposes of this suit were: (1) To abate and enjoin continuance of nuisances consisting (a) of a plant for rendering garbage and bodies of dead animals to extract grease therefrom, and (b) of large hog pens in connection therewith; and (2) to enjoin the manner in which the plant and pens were operated. The suit was filed May 31, 1943, and tried July 29-Aug. 1, 1943, to the court. The plant was located about half way between Temple and Belton on U. S. Highway 81, at a rural community called Midway. The materials from which grease was rendered consisted in the main of kitchen garbage from Camp Hood and North Camp, two large army camps located respectively 23 miles west and 53 miles northwest of Midway. This material amounted to about 80 tons per day. Other material used was obtained from hospitals and an abattoir in Temple, and bodies of dead animals collected within a 35-mile radius of Midway. Grease was also purchased from collectors thereof from housewives in the vicinity. This item, however, was inconsequential. The plant was located upon a tract of about 15 acres abutting on the south side of Highway 81, and about 100 feet from the Highway. Successful plaintiffs (appellees here) were owners severally of small tracts upon which they resided, situated across the highway to the north or northwest of the plant. Defendants (appellants here) were Seastrunk Rendering Company, Ltd. (a limited partnership of which J. W. Seastrunk and W. M. Romig were its general partners), and its members. In the summer of 1942, defendants had obtained a contract to dispose of all kitchen garbage at these camps, and at once began construction of the plant, which was sufficiently completed to begin operations in the fall of that year. The garbage was hauled to the

plant in large metal containers uncovered except by canvas, which was concededly ineffective in windy weather. The rendering process was either in a dry cooker or wet cooker. In the former meat and bone portions of the garbage and the bodies of animals were cooked. This cooker consisted of a large horizontal double cylinder. The material was dumped into the inner cylinder, which was then closed and steam was then injected into the outer (enclosing) cylinder, and the contents of the inner cylinder was thus subject to a high temperature under high pressure for several hours. Upon completion of the cooking process, the contents was then dumped into an open strainer, thus allowing a large amount of the grease to drain off. Grease from the residue was then extracted by means of a hydraulic press, similar to those used in cotton seed oil mills. What still remained, which was in the form of "cake", was ground, sacked and sold for feed. The rest of the garbage was rendered in the wet cookers, of which there were six. In these the steam was applied directly to the garbage, the cooking being also under high pressure. The steam, laden with the odors from the cooking garbage, eventually escaped (under water) through a pipe which terminated in an open tank. The residue from the wet cookers had been disposed of in part by dumping on the back part of the 15 acres, in part by feeding it to the hogs, and in part by spreading on a barley field to the south of the 15 acres. Shortly before the trial defendants had constructed a dehydrating apparatus, to dehydrate the residue from the wet cookers; which they expected to grind and sack for feed as in the case of the dry cooker residuum. They were also contemplating installing an apparatus designed to eliminate the odors from the steam and cookers through consumption in the furnaces supplying heat for the cookers. The hog pens had a capacity of about 2500 head, and at times they were filled to capacity. At the time of the trial there were only about 300 head and about the same number of pigs. Seastrunk testified that he had quit buying hogs, and expected to discontinue the pens as soon as the pigs were large enough to market. A small, unscreened shed had been constructed to the rear of the plant, in which to place the bodies of dead animals until they were hoisted into the skinning room, where they were skinned, the offal removed, and they were cut up and deposited in the dry cook-

er along with other meat and bone substances. At times bodies were deposited on the ground near the pens. A detailed description of the extremely unsanitary conditions of the plant and pens is unnecessary. The evidence upon this point was overwhelming. In fact, that conditions were "very bad" was admitted by Seastrunk and Romig. Nor is it necessary to detail the injuries inflicted upon each of the appellees in the use and enjoyment of their homes resulting from the obnoxious and nauseating odors and the excessive number of flies emanating from the plant, pens and other portions of the premises. The trial court set forth these conditions and results in his judgment, and found, specifically, that they could each be remedied—findings abundantly supported by the evidence, and not challenged in this court.

The decree perpetually enjoined defendants from:

"(1) Placing uncooked bodies of dead animals or parts thereof, in which decomposition has begun, at or in said rendering plant or at any place on defendants' premises at Midway between Belton and Temple within 300 yards of the public highway designated as U. S. Highway #81, except directly into then operating cookers at said plant or into a well inclosed, screened room;

"(2) Operating defendants' rendering plant at Midway between Belton and Temple after September 10, 1943, in such a manner as to cause odors materially offensive to persons of ordinary sensibilities to invade the homes of said Successful Plaintiffs, or in such manner as to result in the breeding of flies or the transportation to the Midway Community of flies that will be a menace to the health of said Successful Plaintiffs;

"(3) Keeping hogs on the defendants' premises at Midway between Belton and Temple after August 26, 1943, in such a manner as to cause odors materially offensive to persons of ordinary sensibilities to invade the homes of said Successful Plaintiffs, or in such manner as to result in the breeding of flies that will be a menace to the health of said Successful Plaintiffs."

While appellants' brief presents ten points, in substance they are but two, that:

1. The decree is too indefinite in certain particulars (points 1 to 5). And

2. Under the doctrine of "comparative injury" and "balancing of equities" the "nuisance" complained of should not have

been restrained (points 6 to 9), and especially so (point 10) since the plant was producing vital war material (grease from which glycerin was extracted); the remedy of appellees being suits at law for damages.

As to the second of these points it is only necessary to say that the court did not enjoin operation of the plant or pens; but only the manner in which they were being operated; the deleterious effects of which the court held to be remediable. A consideration of this point would therefore be academic.

Upon the first point:

As related to paragraph (1) of the decree it is overruled. The only possible criticism there lies in the clause "in which decomposition has begun." We think the expressed condition capable of reasonably definite scientific ascertainment. If this clause had been omitted altogether, the paragraph would not have been subject to successful attack.

We sustain the point as it relates to paragraphs (2) and (3) of the decree. The authorities upon this point are agreed (so far as our research goes) in support of this holding. The Texas cases directly on the point are: Lone Star S. Co. v. Blount, 49 Tex.Civ.App. 138, 107 S.W. 1163; Royalty v. Strange, Tex.Civ.App., 204 S.W. 870; Ft. Worth Acid Works v. Ft. Worth, Tex.Civ.App., 248 S.W. 822, affirmed on other grounds in Commission opinion 259 S.W. 919; Thomas v. International Seamen's Union, Tex.Civ.App., 101 S.W.2d 328; Borden Co. v. Local No. 133, Tex.Civ.App., 152 S.W.2d 828. A leading case cited by the above decisions and widely cited generally is Ballentine v. Webb, 84 Mich. 38, 47 N.W. 485, 488, 13 L.R.A. 321. See also 39 Am.Jur., p. 443, and notes 2 and 3; 28 Id. p. 473, and notes 20 and 1; 32 C.J., p. 368. The rule is thus stated in 39 Am.Jur., p. 443:

"A decree enjoining a nuisance should specifically point out the things which the defendant is required to do and to refrain from doing in order to abate the nuisance which is found to exist. It should be as definite, clear, and precise in its terms as possible, so that there may be no reason or excuse for misunderstanding or disobeying it, and, when practicable, it should plainly indicate to the defendant all the acts which he is restrained from doing, without calling upon him for inferences or conclusions about which persons may well differ."

In the Ballentine (a slaughterhouse) case, it was said:

"The trouble with the decree is that it fails to point out specifically what defendant is required to do in order to comply with its requirements. To adjudge that defendant should so conduct his business as not to be offensive is to give him no rule of conduct which the law had not before prescribed. The decree should have specifically pointed out the things that defendant was required to do, and to refrain from doing, in order to abate the nuisance which the court found to exist."

The opinion concluded:

"Under the general prayer for relief, complainants are entitled to a decree requiring defendant to remove from his premises every day all manure, blood, offal, hair, and other refuse of his establishment in covered garbage wagons, such as are in use by the board of public works in the city of Detroit, or in other wagons that will effectively avoid the spread of offensive odors; to thoroughly clean, cleanse, and disinfect his premises daily; to provide sufficient pens for the hogs in store so that they shall not be crowded and rendered noisy and quarrelsome by discomfort while in confinement; and to use such other precautions as are necessary to render his place of business clean and wholesome."

The trouble with paragraphs (2) and (3) is that they do not command or restrain any specific acts, but merely require operation (generally) in such manner as to preclude certain specified results, not ascertainable with certainty in advance, namely, "odors materially offensive to persons of ordinary sensibilities," or flies bred or transported "that will be a menace to the health," etc.

Appellees contend that these quoted expressions embody standards well recognized by the law. This may be conceded in so far as concerns appellants' duties to appellees and the public generally. But (as held in the Ballentine case) to so decree would give to appellants "no rule of conduct which the law had not before prescribed." To warrant a decree of injunction, enforceable through contempt proceedings, the acts commanded or restrained must be described in the decree with sufficient definiteness for the defendant to know in advance what he must or must not do in order to abide by the decree and escape the penalties attaching to its infringement. The vice in the decree lies in the fact that it en-

joins, not specific acts or omissions, but results, evidence of the existence vel non of which must of necessity be determined by the opinion evidence of witnesses, which could not be forecast or anticipated.

Since paragraph (1) of the decree is clearly severable from the other two paragraphs, the decree as to it is affirmed. As to paragraphs (2) and (3) the decree is reversed and the cause remanded. ◆

Affirmed in part and in part reversed and remanded.