GLADYS M. LYNCH, petitioner, v. HONORABLE HARVEY UHLEN-
HOPP, Judge of Eleventh District of Iowa, respondent.

No. 48862.

(Reported in 78 N.W.2d 491)

SEPTEMBER 18, 1956.

REHEARING DENIED · NOVEMBER 16, 1956.

Robert B. Kay and Marvin G. Kjellberg, of Clarion, for petitioner.

Kelleher & Kelleher of Fort Dodge, for respondent.

Leo Pfeffer, Will Maslow and Shad Polier, all of New York City, for American Jewish Congress, as amicus curiae, file brief for petitioner.

THOMPSON, C. J.—The petitioner, Gladys M. Lynch, was married to Francis L. Lynch on November 27, 1939. Two sons, Jerry F. Lynch, the elder, and Richard R. Lynch, were the only issue of this marriage. A divorce was granted to the petitioner, as plaintiff in the action, on April 9, 1953, in the District Court of Wright County. On April 8, 1953, the parties entered into a stipulation, the material part of which provided: "Item I. That the care, custody and control of Richard R. Lynch shall be awarded to the Plaintiff (Gladys M. Lynch) and it is provided that the said child shall be reared in the Roman Catholic Religion and that the Defendant (Francis L. Lynch) shall have the right of visitation at all reasonable hours and that the Defendant shall pay monthly support money of $40.00 per month commencing with the date of decree." Other provisions of the stipulation concerned the custody of Jerry F. Lynch and a property settlement between the parties, none of which is material here. All of the provisions of the stipulation were incorporated in the decree. Richard was about five years old at this time, and was in his seventh year when the contempt proceedings were instituted.

The record shows that the petitioner was at the time of the divorce, and apparently still is, a Protestant, while Francis L. Lynch has at all material times been a Roman Catholic. On June 17, 1955, Francis L. Lynch filed his "Information for Contempt" setting out Item I of the stipulation, as made a part of the decree, and alleging that prior to the divorce Richard had been baptized in the Roman Catholic Church and reared as a member of that

church. Violation of the decree by the petitioner in that she "has not reared and is not rearing said minor child in the Roman Catholic religion or in accordance with the teachings and practice of said religion, and she has announced her purpose and determination not to observe, perform or comply with said provisions of said decree; and has announced her purpose and intention not to observe or recognize as binding on her, said provision" was pleaded. Upon hearing, the respondent found the petitioner guilty of contempt because of failure to obey the quoted portion of the decree; but it was provided that the hearing be continued for two weeks from the date of entry of the judgment of contempt for the purpose of passing sentence; and that "if plaintiff files her affidavit in this cause by that date that she is rearing the child in the Catholic faith, then she shall stand purged of contempt to this time; otherwise appropriate punishment to be inflicted."

It appears without contradiction that the petitioner, since the divorce, has not taken Richard to a Roman Catholic Church, but that he has been attending a Congregational Church Sunday school, and has attended a Bible school summer camp, apparently conducted by the same church, for about two weeks in the summers of 1953 and 1955. Mrs. Lynch did not take him to Sunday school, but sent him with her "former sister-in-law"; she "saw that he got there." The father's right of visitation was not denied him, and twice he took the boy to the Roman Catholic Church. The father says, and the mother denies, that she stated she would not raise the boy in the Roman Catholic faith. The petitioner, as a witness, said that she refused to sign the first stipulation presented to her because it obligated her to raise Richard as a Roman Catholic, "because it would be too inconvenient to do so * * *." She testified it was her understanding "when he got old enough to make a choice that I wouldn't interfere in any way. That is the way it was stated to me before the divorce. That is the way it was stated to me by Mr. Henneberry (the husband's attorney in the divorce action) and Mr. Kay (her own attorney)."

Although constitutional questions are present, another defect in the proceedings is deemed by a majority of this court to be so clearly apparent as to require that the writ of certiorari be sustained, before the issue of constitutionality is reached. We shall discuss this matter first.

72

■ I. Contempt proceedings are quasi-criminal. While the object to be attained is often civil obedience, the punishment frequently resembles that inflicted for violation of the criminal laws. The rule is thus stated in 12 Am. Jur., Contempt, section 67, page 434:

"While contempts are not to be regarded in any sense as a substitute for the ordinary criminal laws of the country, they are, in their essential characteristics, to be deemed primarily criminal and punitory. * * * Proceedings for contempt are therefore commonly treated as criminal in their nature even when they arise in civil actions."

■ It is well settled that a judgment may be so indefinite and uncertain as to be wholly void. 30 Am. Jur., Judgments, section 20, page 828.

■ In 49 C.J.S., Judgments, section 72, pages 191, 192, it is said: "A judgment must be definite and certain in itself, or capable of being made so by proper construction. It must fix clearly the rights and liabilities of the respective parties to the cause, *and be such as defendant may readily understand* and be capable of performing * * *. Where the record entry is wholly uncertain * * * the judgment is at least erroneous, and it may be void." (Italics added.)

■ This is particularly true in contempt proceedings, where the alleged contemnor is in danger of drastic punishment if the judgment does not clearly inform him what is required. The contempt proceeding is so near in its nature to criminal prosecutions that the well-known rule which commands that one cannot be convicted of a crime unless the statute is clear and definite so that he may know what he can and what he cannot do, is at least analogous.

The Supreme Court of California has said: "The rights of the parties under a mandatory judgment whereby they may be subjected to punishment as contemnors for a violation of its provisions, should not rest upon implication or conjecture, but the language declaring such rights or imposing burdens should be clear, specific and unequivocal so that the parties may not be misled thereby." Plummer v. Superior Court, 20 Cal.2d 158, 164, 124 P.2d 5, 8.

This language was quoted with approval by the Supreme Court of Colorado in Golden Press, Inc. v. Rylands, 124 Colo. 122, 235 P.2d 592, 28 A.L.R.2d 672, 677.

 To the same effect is the holding of the Nevada Supreme Court in State ex rel. Smith v. Sixth Judicial District Court, 63 Nev. 249, 257, 167 P.2d 648, 651. The court there said:

"A judgment or decree may be so uncertain and indefinite as to be impossible of administration, unenforceable and void. And a judgment may be partly valid and partly void. [Citing authorities]

"It is well settled that indefiniteness and uncertainty in a judgment or decree may constitute a good defense in contempt proceedings [with further citations]."

In State v. Oppal, Ohio App., 77 N.E.2d 270, 271, the defendant had been cited for contempt for failure to execute a quitclaim deed as ordered by the court in a divorce action. The property was encumbered by a mortgage upon which the defendant was personally liable. The decree did not disclose whether she was to be held harmless from this liability upon executing the deed. The Ohio appellate court held the decree was so uncertain that its provisions could not be enforced by contempt, and reversed the judgment of guilty against the defendant. It cited 23 Ohio Jurisprudence, section 153, page 621: " 'Inasmuch as the judgment and its enforcement are the end and aim of the whole litigation, to satisfy this purpose the judgment must so dispose of the matters at issue between the parties that they and such other persons as may be affected, will be able to determine with reasonable certainty the extent to which their rights and obligations have been determined.' "

In Howard S. Tierney, Inc. v. James, 269 App. Div. 348, 354, 355, 56 N.Y.S.2d 8, 13, 14, the defendant had been enjoined from soliciting, accepting or receiving insurance business from customers of the plaintiffs who had not been specifically allotted to him by arbitrators. The trial court found him in contempt for violation of this order. The New York Supreme Court reversed, saying: "The better way would have been to list in the interlocutory judgment the names of all customers, dealing with whom was enjoined, thus eliminating all doubt." The court held the injunction void for indefiniteness, quoting: " 'Unless a con-

tempt proceeding is based upon an order which is clear and precise, no finding of contempt may be made.'" Matter of Mitchell v. Sperling, 229 App. Div. 204, 205, 241 N.Y.S. 543, 545. The point is well stated in Ketchum v. Edwards, 153 N.Y. 534, 539, 47 N.E. 918, 920: "But as punishment for contempt involves, or may involve, not only loss of property but liberty, it is a reasonable requirement that the mandate alleged to be violated should be clearly expressed * * *."

A sound expression of the rule is found in Seastrunk Rendering Co. v. Hollingsworth, Tex. Civ. App., 177 S.W.2d 1014, 1016, 1017: "To warrant a decree of injunction, enforceable through contempt proceedings, the acts commanded or restrained must be described in the decree with sufficient definiteness for the defendant to know in advance what he must or must not do in order to abide by the decree and escape the penalties attaching to its infringement. The vice in the decree lies in the fact that it enjoins, not specific acts or omissions, but results, evidence of the existence vel non of which must of necessity be determined by the opinion evidence of witnesses, which could not be forecast or anticipated."

The language is appropriate in the case at bar, since we think it would at least require expert opinion to determine what steps must be taken to rear the boy in the specified religion.

In Weber v. Superior Court of Yolo County, 26 Cal.2d 144, 148, 156 .P.2d 923, 925, 926, the Supreme Court of California said (quoting from Brunton v. Superior Court, 20 Cal.2d 202, 205, 124 P.2d 831, 833): "It is well established that 'the acts constituting the contempt must be clearly and specifically prohibited by the terms of the injunction', and that the 'party bound by an injunction must be able to determine from its terms what he may and may not do; he cannot be held guilty of contempt for violating an injunction that is uncertain or ambiguous'."

So in Ex parte Vaughn, 205 Ala. 296, 298, 87 So. 792, 793, it was held that the divorced mother was not guilty of contempt for removing the child from the jurisdiction of the court and so in effect depriving the father of visitation rights granted him by the decree, there being no specific prohibition against such removal. The Alabama Supreme Court said: "It has been held that

the charge of contempt cannot be established for failure to comply with uncertain orders or judgments."

To the same effect are Hutcheson v. Hutcheson, 197 Ga. 603, 30 S.E.2d 107; Carroll v. Hinchley, 316 Mass. 724, 56 N.E.2d 608, 612; Johnson's Case, 242 Mass. 489, 494, 136 N.E. 563, 565; and Garrison v. Davis, 88 Utah 358, 368, 54 P.2d 439, 444 ("If a judgment is so uncertain as not to admit of enforcement it will be declared void.")

██ II. Applying the foregoing well-established principles to the instant case, and keeping in mind that we have before us a contempt proceeding in which the punishment will in all probability be a fine or imprisonment of unknown but real severity, we can only conclude that that part of the decree involved should be held void for uncertainty and indefiniteness. The pertinent language is this: "It is provided that the said child shall be reared in the Roman Catholic Religion * * *." Is this language so clear, specific and unequivocal that it can be readily understood? Are the steps which must be taken so certainly pointed out that a judgment of contempt and substantial punishment should follow if the required things are not done? The decree must meet these tests, or it is void and unenforceable.

A negative answer to the question posed.is clearly indicated. How are we to determine what must be done to rear a child in any given religion? Religion itself is a term difficult to define. In United States v. Kauten, 2 Cir., N.Y., 133 F.2d 703, 708, Judge Augustus N. Hand said: "It is unnecessary to attempt a definition of religion; the content of the term is found in the history of the human race and is incapable of compression into a few words." In Girard Trust Co. v. Commissioner of Internal Revenue, 122 F.2d 108, 110, is this language: "Religion includes a way of life as well as beliefs upon the nature of the world * * *."

Since the Roman Catholic Church is a Christian church, this reference to the Christian religion is of interest: "Without undertaking a definition, the Christian religion, in its most important ultimate aspect, recognizes, has faith in and worships a Divine Being or Spirit—one Father of all mankind—who has the power to and will forgive the transgressions of repentants and care for the immortal souls of the believers, and which belief brings earthly solace and comfort to and tends to induce right

living in such believers." Taylor v. State, 194 Miss. 1, 34, 11 So.2d 663, 673. In this aspect, all Christian churches hold to the same basic religion.

Both Funk & Wagnall's New Standard Dictionary and Webster's New International Dictionary give somewhat long, involved and alternative definitions of religion. But the word "religion" is often confused in terms with cultus or form of worship of the different denominations. Township of Maplewood v. Albright, 13 N.J. Misc. 46, 176 A. 194, 195; Gabrielli v. Knickerbocker, 12 Cal.2d. 85, 82 P.2d 391, 393; Davis v. Beason, 133 U.S. 333, 10 S. Ct. 299, 300, 33 L. Ed. 637. So we think the parties and the court here confounded the terms. They referred to the "Roman Catholic Religion" when they meant the cultus or forms of worship of that church; perhaps what was really intended was that the child should be reared in the Christian religion in conformity to the forms, discipline, organization and dogma of the Roman Catholic Church. If nothing more than the Christian religion was intended, rearing in any Christian church would satisfy the requirements of the decree; but obviously more than this was meant.

We must turn then to the factual situation to determine whether the language imposing burdens upon the petitioner in the original decree was so clear, definite and specific that she could readily understand it and so be capable of performing what was required of her. The decree itself does not specify who shall rear the child in the stated religion; in fact the record shows he had been baptized in the Roman Catholic faith and after the divorce his father had taken him to church on a few occasions. The petitioner says her understanding of the decree was that the question should be left open until the boy reached an age where he would be capable of deciding for himself. It may be argued that since the petitioner was given the custody of the child, the major duty of complying with the portion of the decree in controversy, if it could be complied with, was upon her. The controversy at this juncture merely points up the indefiniteness and uncertainty of the controversial portion of the decree. There is some force to the petitioner's contention that she, not being a communicant of the Roman Catholic Church, would find it inconvenient to attend its services, and difficult to

train the boy in its forms and beliefs. The decree itself is silent as to whose duty it was to do these things.

It may seem at first impression that the decree tells the petitioner sufficiently what she must do. But this impression, if indeed it be held at all, will not bear analysis. What constitutes "rearing" a child in the religion or cultus of this church, or of any church? Must he be taken to church once a week, or once in two weeks, on Sunday? If midweek services are held, must he be taken to them? Is it required that he attend catechism class? Must he attend a parochial school if the particular denomination in question maintains such schools? What fast days must be observed, what Lenten observances followed? Would it be sufficient if the child be required to conform to a part of these things, and, if so, which part? Or are all of them required? The difficulty would be the same, no matter what church might be named in such a decree as the one now before us.

Further, small boys are not usually sent to church services unaccompanied. Not being highly trained, as a rule, in the social graces and amenities, they need some adult control. Is it required that the petitioner, although not a communicant of this church, attend its services regularly with her son? The decree gives no answer.

Again, the matter of rearing a child in any religion is commonly, and we believe properly, thought to be a matter of co-operation between church and home. In order to avoid a conviction for contempt here, must the petitioner endeavor to supplement the teachings of the church, of which she is not a member, in her home? Without this co-operation, church attendance might well result in lip service only, to the faith taught there.

The fact that the exact duties required of the petitioner are vague and uncertain is somewhat pointed up by her own testimony of what she understood she was to do. The trial court, after finding her guilty of contempt, continued the hearing for some weeks, with the provision that if by a specified date the petitioner filed her affidavit that she was rearing the boy "in the Catholic faith" she should stand purged of contempt. There is still no indication of what specific action she should take. The court apparently left it to her to determine what was meant; but

she had already told her version of the meaning of the doubtful clause in the decree and found it unacceptable.

Her affidavit would of course be subject to challenge, and the court would then find it necessary to determine what specific steps the petitioner must take to comply, and this determination would necessarily be based upon opinion. It must be noted that the part of the decree with which we are concerned here is not merely a prohibition against doing a certain act. It is affirmative, or mandatory, requiring the performance of unspecified acts; acts which would meet the test of rearing the child in conformity with the various forms of worship of the church. Only those learned in the theology, the discipline and the organization of the church would know what these might be; and even among them, as among experts in all lines, differences of opinion might exist. Controversies arise within churches concerning the governing rules; see Ragsdale v. Church of Christ, 244 Iowa 474, 55 N.W.2d 539; Keith v. First Baptist Church, 243 Iowa 616, 50 N.W.2d 803. Many other cases might be cited. Theologians no longer dispute the formerly much-mooted question of how many angels could dance upon the point of a pin; but there are still many areas where entire agreement is lacking, even in the same church.

If the court meant to pronounce its original decree which would be so clear and definite that all parties could understand what was meant by it and what they must do to comply, it should have spelled out an interpretation of what it would consider sufficient to show a "rearing in the Roman Catholic religion"; whether this imposed a duty upon the petitioner to take the boy to church regularly, or to other ceremonies and forms of observance and instruction in that church, or to parochial school, or to several or all of them; and whether or not she was under any duty to instruct and encourage the child in the adoption of this faith, in their home. These questions can be answered only by the uncertainties of opinion and conclusion evidence. The petitioner, left without any real guide, is now being punished for violation of a judgment so indefinite and uncertain, in the respect in question, that it must be held to be wholly void.

III. The evidence shows that the child was being taken, at

least with the consent of the mother, to a Congregational Church Sunday school. It may be urged that, even though the decree is not clear as to what she must do, at least she should not direct or permit instruction in another church with different forms of worship. The point is without merit. If the controversial part of the decree is void for uncertainty, as we have held, it is not binding upon the petitioner and she cannot be in contempt. She cannot be held in contempt unless the provisions of the decree are clear, specific and unequivocal so that she may know what she must do to obey them. Contempt cannot be predicated upon an alleged violation of a void decree. Carter v. Utterback, 200 Iowa 82, 83, 204 N.W. 446, 447; Geneva v. Thompson, 200 Iowa 1173, 1175, 1176, 206 N.W. 132, 133; Dayton v. Patterson, 216 Iowa 1382, 1388, 250 N.W. 595, 598; Kreling v. Superior Court, 18 Cal.2d 884, 118 P.2d 470, 471.

It is of course well settled that a void judgment may be collaterally attacked. Dayton v. Patterson, supra, page 1388 of 216 Iowa, page 598 of 250 N.W.

IV. The petitioner raised the point considered in the preceding divisions by her motion to direct; sketchily, perhaps, but we think sufficiently. The grounds of the motion were that the evidence failed to show contempt or that the conduct of the petitioner was willful; and that there was no sufficient showing that the petitioner is able to comply with the decree. The court did not directly rule upon the motion, saying it would determine it with the main case. The motion was made at the close of the informant's evidence, and was not renewed at the close of the entire case. Generally, such renewal is required; but here it was not necessary, since the court had not ruled upon it, but had taken it under advisement, to be decided with the case. The motion being already before the court, it was not necessary to renew it.

In argument in this court, petitioner urges that the decree does not command her to do or to refrain from doing anything, and so disobedience is impossible. Ex parte Vaughn, supra, is also cited as authority for the proposition that failure to comply with uncertain orders or judgments cannot be contempt.

Nor could the judgment of the trial court be upheld

here if petitioner had at no time raised the question of uncertainty. If, as we have pointed out, the decree is so uncertain and indefinite that it does not advise petitioner what she must do or not do, and so is void so far as a contempt proceeding is concerned, it would be a denial of justice to say she could nevertheless be punished for disobeying it. Generally, points not raised in the trial court, or not argued in this court, cannot be made the basis for reversal. But a different rule prevails where there is no jurisdiction. "Strictly speaking, lack of jurisdiction means lack of judicial power to act in the premises * * *." 21 C. J. S., Courts, section 15b, page 32. And it is the duty of a court to take notice of a lack of jurisdiction on its own motion, even though the question is not raised by the contending parties. 21 C. J. S., Courts, section 114, pages 175, 176. In 3 Am. Jur., Appeal and Error, section 839, it is said: "This question cannot, so far as jurisdiction of the subject-matter is concerned, be waived by the parties or overlooked by the court." We ourselves have said: "This point is not raised by the defendant, but, as it is jurisdictional, we are required to consider it, and avoid exercising authority in a case wherein we have no jurisdiction." Quinn v. Capital Insurance Co., 82 Iowa 550, 553, 48 N.W. 935, 936. Likewise, it seems self-evident that a court attempting to enforce a void decree by contempt proceedings is acting illegally and without jurisdiction. Kreling v. Superior Court, supra, at page 887 of 18 Cal.2d, page 472 of 118 P.2d. Since we think the question was sufficiently raised both in the trial court and here, we shall not elaborate the point further.

V. While probably not decisive of the case, it may be well to point out the unfortunate effect upon the child of an attempt to enforce the vague and uncertain provisions of any decree ordering religious training. The able trial court was disturbed by this aspect of the case. It said:

"There is the matter of separating church and state; the possibility of inharmony with the mother going to one church and the child to another; the difficulty of policing this part of the decree; the cumbersome nature of court processes compared with the sensitive nature of this subject; and so on. Surely these are good reasons for parties not placing a provision on religion in a default decree * * *."

Our court is committed to the rule that the welfare of the child is generally the governing purpose in all proceedings involving custody, care and training. Chiefly for this reason, the courts have generally refused to enforce agreements between the father and mother concerning the religious training of children, but have held that the parent having custody is not bound by a previous contract. 29 Harvard Law Review 485, 492; Zollmann, American Church Law, 46 to 49; Andrews v. Salt, L.R. 8 Ch. App. 622; Brewer v. Cary, 148 Mo. App. 193, 127 S.W. 685–692 inclusive; Boerger v. Boerger, 26 N. J. Super. 90, 97 A.2d 419, 425, 427.

In the latter case, at page 104 of 26 N. J. Super., page 427 of 97 A.2d, it is said: "The parent to whom custody is awarded must logically and naturally be the one who lawfully exercises the greater control and influence over the child. The mother, who lives with the child more than six days a week, as contrasted with the father's limited visitation of a few hours on Sunday, is the one who actually rears the child and shapes its moral, mental, emotional and physical nature. To create a basic religious conflict in the mind of the child, and between it and its custodian, would be detrimental to its welfare."

A thorough discussion of this problem is found in Brewer v. Cary, supra, another case in which the court declined to enforce a contract concerning the religious upbringing of a child.

We are cognizant of the fact that the trial court had already decreed performance of the contract for religious rearing of the child Richard. The respondent herein, although questioning the wisdom of the provision in the original divorce decree concerning religious training, felt he was bound by it. In this we think he was in error, because of the indefiniteness of the controversial clause.

Not only do we think, as we have indicated, that the questioned provision must fail for lack of certainty, but its enforcement under such circumstances as here would do much harm, no matter what the denomination involved. The child is already the unfortunate victim of a broken home. He is only seven years of age. Controversies between his father and mother, arising from the uncertain provisions of the divorce decree as to his training will certainly subject him to many harmful prob-

lems. With constant bickering of his parents concerning compliance or noncompliance with the decree, the real sufferer would be the child.

Courts should be slow to place provisions controlling religious beliefs in decrees, even granting certainty and constitutionality and the consent of the parties.

VI. Although the constitutional questions are not determinative in view of our holdings in Divisions I, II, III, and IV, they will bear some consideration. The respondent recognized the danger of violation of the First and Fourteenth Amendments to the United States Constitution and of Article I, section 3 of the Constitution of the State of Iowa; but he thought that the agreement of the parties removed the disputed part of the decree from the purview of these constitutional prohibitions. He said: "* * * no one is imposing a particular faith on the parties; they have chosen to impose it on themselves.

"It is simply a case of the parents bringing the thing down on themselves; and of their involving the Court in an area into which the Court perhaps should not have been taken."

This may be doubted. This is not a case in which the contract is merely used as a defense, as was true in Rice v. Sioux City Memorial Park Cemetery, 245 Iowa 147, 154, 155, 60 N.W.2d 110, 115. In the case before us the court is actively enforcing the provisions of the decree. The Supreme Court of the United States has said, in Shelley v. Kraemer, 334 U. S. 1, 68 S. Ct. 836, 92 L. Ed. 1161, 3 A.L.R.2d 441, and Hurd v. Hodge, 334 U. S. 24, 68 S. Ct. 847, 92 L. Ed. 1187, that this may not be done.

In the words of Mr. Justice Jackson in West Virginia State Board of Education v. Barnette, 319 U. S. 624, 642, 63 S. Ct. 1178, 1187, 87 L. Ed. 1628, 147 A.L.R. 674: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or 'other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us."

It is now well settled that the Fourteenth Amendment makes applicable to the states the restrictions of the First Amendment, in particular those forbidding interference with, or pre-

scription of, religious beliefs or training. People of Illinois ex rel. McCollum v. Board of Education, 333 U. S. 203, 68 S. Ct. 461, 92 L. Ed. 648, 2 A.L.R.2d 1338; and these limitations extend to all branches of the State Governments, including the judiciary. Shelley v. Kraemer, supra; Bridges v. State of California, 314 U. S. 252, 62 S. Ct. 190, 86 L. Ed. 192.

In Rice v. Sioux City Memorial Park Cemetery, supra, at page 155 of 245 Iowa, page 115 of 60 N.W.2d, we discussed the meaning of Shelley v. Kraemer, supra, and Hurd v. Hodge, supra, and concluded that they prohibited the state or any of its agencies from enforcing a contract which violated constitutional prohibitions; but we distinguished the case then at bar on the ground that the state was not taking an affirmative part in enforcement of the alleged offending agreement. We said:

"While we must recognize an evolution of our society as disclosed by these recent decisions [Shelley v. Kraemer and Hurd v. Hodge, both supra], all of the previous decisions may be distinguished from our present case in that they disclose the exertion of governmental power *directly* to aid in discrimination, or other deprivation of right."

In the instant case the respondent, as the trial court, was directly enforcing the offending provision of the contract.

The writ of certiorari is sustained, with directions to dismiss the information charging contempt.

HAYS, LARSON, PETERSON, and WENNERSTRUM, JJ., concur.

BLISS, GARFIELD, OLIVER, and SMITH, JJ., dissent.

BLISS, J. (dissenting)—I dissent from the majority opinion in Cause No. 48862. I note no errors therein respecting the statement of facts or of the matters of procedure, but I wish to elaborate on them somewhat. The parties were engaged in farming near Eagle Grove in Wright County, Iowa. The family consisted of themselves and two sons, Jerry F. and Richard R. The marriage apparently was not a successful venture, and Mrs. Lynch, by counsel, filed petition for divorce alleging cruel and inhuman treatment by her husband such as to endanger her life and health. Mr. Lynch, though represented by counsel, did not personally

appear at the trial, filed no pleading, and offered no evidence. On the testimony of Mrs. Lynch and her corroborating witness, the court, by its judgment and decree, found that the allegations of the petition were true, that the parties had an accounting between themselves and "reached an agreement as to property rights, alimony, child support and costs of this action, and that plaintiff is entitled to the relief demanded in her petition." The care, custody and control of the elder boy, Jerry, was awarded to the father, Francis L. Lynch, with the right of reasonable visitation by Gladys M. Lynch, the mother. As set out, verbatim, in the majority opinion, the care, custody, and control of the younger child, Richard, was awarded to the plaintiff-mother, Gladys M. Lynch, with the proviso "that the said child shall be reared in the Roman Catholic Religion." The decree provided for the right of the father to visit Richard at reasonable times, and required him to pay for the support and maintenance of Richard at the rate of $40 per month from April 9, 1953, the date of the decree. All clothing and personal effects of Mrs. Lynch and specified household goods and furnishings which she owned prior to the marriage were also awarded to her. As a complete settlement of all property rights of the parties, and in full of all alimony, support money or money claims, Mrs. Lynch was awarded $3500, payable $1500 on the date of the decree, $1000 on January 1, 1954, and the balance of $1000 on January 1, 1955. All other personal property of every kind was awarded to Mr. Lynch. It appears from the record that Mr. Lynch met all money and property obligations required of him by the decree. The final provision of the judgment and decree is: "The court retains jurisdiction to compel performance of the provisions of the decree and to see that the same are carried into effect by the parties hereto."

On the decree is the following notation:
"Approved:
/S/ J. J. H. Attorney for the Defendant
Filed April 9, 1953 /S/ R. V. Goslin, Clerk Dist. Court
Wright County, Iowa."

The initials "J.J.H." are those of J.J. Henneberry, attorney for defendant.

Either prior to the commencement of the divorce proceedings or thereafter, each of the parties had consulted with legal counsel, and they had agreed upon all matters incident to the divorce proceedings, and evidenced the same by a written stipulation which they executed on April 8, 1953. This stipulation was prepared by Mrs. Lynch's attorney. The first paragraph was: "It is hereby stipulated by and between the parties hereto that their property rights and the custody of minor children be settled subject to the approval of the court, and to the court granting a decree of divorce to the plaintiff." The provisions which followed respecting the determination of alimony, support money, property division, and custody of the children were identical with those in the judgment and decree. When the stipulation was presented to Mrs. Lynch by her attorney she read it over and because of the provision therein, "that the care, custody and control of Richard R. Lynch shall be awarded to the plaintiff *provided however* (italics mine) that the said child shall be reared in the Roman Catholic Religion * * *", she refused to sign the stipulation, as she said: "Because I wouldn't raise him as a Catholic if I was going to have him in my custody because it would be too inconvenient to do so, so they changed it." The stipulation was then changed to read: "That the care, custody and control of Richard R. Lynch shall be awarded to the plaintiff *and it is provided* (italics mine) that the said child shall be reared in the Roman Catholic Religion * * *." As so changed, the stipulation was then executed by Mrs. and Mr. Lynch on April 8, 1953. The attorney for Mrs. Lynch then prepared the decree in accord with the stipulation and presented it to her and she read and approved it and upon her direction he submitted it to Judge Nichol at the divorce hearing and it was signed by him and filed on April 9, 1953, as above noted.

After the divorce Mr. Lynch assumed the care, custody and control of the boy, Jerry, then about eight years old. Richard was between five and six years old. Their father was of the Roman Catholic faith and the two boys had been baptized according to its rites, and such religious teaching and training as they had received was in the Roman Catholic religion. Mr. Lynch continued this with Jerry after he became his sole custodian.

The following appears from interrogation of Mrs. Lynch by the Respondent Court.

"The Court: Are you a Protestant? A. Yes.

"The Court: And your husband took the other little boy and is raising him a Catholic? A. Yes.

"The Court: And you, so far, are raising this child (Richard) as a Protestant? A. Yes."

This interrogation was in August 1955, and Mrs. Lynch testified that Richard would be eight years old in November 1955.

It does not appear of which Protestant sect or denomination Mrs. Lynch was a member, and it is a fair assumption that she attended no church, since she testified: "I haven't personally taken him (Richard) to the Congregational Sunday school. But he has gone with my former sister-in-law. I see that he gets there." She began sending the boy to a Protestant Sunday school immediately after the divorce decree in 1953. And she sent him to a Congregational Church summer Bible school in 1953 and 1955.

Mrs. Lynch never made the slightest attempt to comply with the stipulation or the decree which she presented to the divorce court. All of her efforts were affirmatively to the contrary. She testified that she had never taken Richard to any Roman Catholic services and did not intend to take him to any in the future, and never attempted to make any arrangements to have him go to the Roman Catholic Church. She said it was too inconvenient to do so, but she readily arranged to have him taken to Protestant services.

Mr. Lynch discussed the matter with her several times and complained of her failure to comply with the decree. He took Richard to Catholic services a few times. He finally told her that he was going to take action to enforce the decree, and did so by filing the contempt information, which brought about her citation and the hearing before the Respondent on August 23, 1955. The able Respondent in his order mentioned the serious and troublesome nature of the issues involved and stated:

"The court began deliberations on the premise that the provision regarding religion cannot be impugned in this proceeding, and that so long as it stands it must be respected. The court has

gone the entire round of the arguments and has come back to the original premise. * * *

"The only questions are (1) whether there was jurisdiction to decree this provision and (2) whether plaintiff violated it. * * *

"There is no doubt but what plaintiff, an educated woman understood the agreement and the decree. Neither is there any doubt but what she is intentionally raising the child a Protestant. It is the plainest kind of a violation of a promise that plaintiff knowingly entered into in order to secure what she wanted. Defendant has faithfully abided by the decree on his part.

"The violation being proved, the only question left is whether the court had jurisdiction so to decree. This is for the reason that although a court ought perhaps not incorporate a provision such as this, if it does so and has jurisdiction it must be respected. We do not have the case of a simple contract covering religion, which some courts say may be disregarded. See Annotation 12 A. L. R. 1146. Here we have a formal decree of a court of general jurisdiction, *sought and secured by the contemnor.* (Italics mine.) It will not do for parties to gamble on the parts of a decree the courts will honor and what will be disregarded. As stated in 17 C. J. S. 21: 'Since an order, judgment, or decree of a court having jurisdiction of the parties and the subject matter cannot be collaterally attacked in the contempt proceedings, but must be modified or vacated if erroneous, by a direct proceeding, disobedience of an order made by a court within its jurisdiction and power is a contempt, although the order may be clearly erroneous.' See also Howat v. Kansas, 258 U. S. 181, 188–190, 42 S. Ct. 277, 66 L. Ed. 550, 559 (even true where decree founded on unconstitutional statute).

"There is no question at all but what the court had jurisdiction of the parties to the divorce proceeding, and had jurisdiction of them to make provision respecting the children. Indeed, the parties by their stipulation laid the matter before the divorce court. Neither is there any real question but that the court had jurisdiction of the subject matter. Our broad statute gives the divorce court general jurisdiction respecting the children and their custody, education, training, welfare, and support. Iowa Code (1954) Section 598.14. * * * At least where the parties

have stipulated the point, a decretal provision on the subject of religion does not cut across Federal or Iowa constitutional provisions respecting freedom of conscience because no one is imposing a particular faith on the parties; they have chosen to impose it on themselves. In such circumstances neither the language of the First Amendment to the Federal, nor of Article I, Section 3 of the State Constitution reaches the case. And no one doubts the right of the parents to direct the course of their children's religion."

The court found the plaintiff in contempt, and continued the proceeding until September 14, 1955, for the purpose of passing sentence, "providing that if plaintiff files her affidavit in this cause by that date that she is rearing the child in the Catholic faith, then she shall stand purged of contempt to this time; otherwise appropriate punishment to be inflicted." A further continuance of fifteen days, to permit certiorari proceedings by plaintiff, was granted. Plaintiff refused the proffer to purge herself by affidavit.

The petition for the writ of certiorari alleges several grounds of illegality and excess of jurisdiction, the substance of them being that: the facts established that petitioner had not willfully disobeyed the decree of divorce by clear, satisfactory and convincing proof, and the findings and judgment of the respondent were contrary to and unsupported by the evidence; the Order of the Court was excessive and unreasonable, illegal, beyond its lawful jurisdiction, and violated the rights of the petitioner guaranteed her by the First, Fifth and Fourteenth Amendments to the Constitution of the United States, and section 3 of Article I of the Constitution of Iowa; the respondent did not rule on petitioner's motion for directed verdict until approximately fourteen days after it was made; and this petitioner has no plain, speedy or adequate remedy for the injustice done her in finding her guilty of contempt except by certiorari.

I. These are the only propositions stated or argued, either orally or in the printed brief and argument in this court, and none other was urged in the court below. However, the majority opinion hardly touches upon any of these propositions. The chief proposition stated and argued in the majority opinion for sustaining the writ is that the decretal order that Richard R. Lynch

be reared in the Roman Catholic religion by the petitioner, who has care, custody and control, is void because of uncertainty and indefiniteness. Such contention was not urged in the court below and was never presented to this court. Its first appearance is in the majority opinion. Furthermore, there is no factually sound or reasonable foundation for the proposition contended for.

I have no particular quarrel with the statement that contempt proceedings are somewhat quasi-criminal, nor with the authorities cited that the decretal or judicial order which the contemnor is charged with violating must be certain and definite. I contend that they have little application under the facts, and for these reasons: the fact of being reared in the Roman Catholic religion—and I will use the term Catholic hereinafter—is not so unknown or abstruse as to be ununderstandable. There are in excess of 30,000,000 members of that faith in the United States, and in all parts of the country there are many thousands of churches, schools, hospitals, and other institutions supported by its members; the petitioner and her Catholic husband were married in 1939, and they lived together for approximately fourteen years; the children were baptized in accord with the rites of the Catholic Church and it may fairly be assumed that such religious instruction as they were capable of receiving during those early years conformed to rearing of children of that faith; the petitioner was not a stranger to rearing of children in the Catholic religion; and she readily told the respondent that Mr. Lynch "was raising Jerry a Catholic." She had been a schoolteacher. She had no difficulty in getting another person to take Richard to a Protestant Sunday school. She, no doubt, could as readily have had someone take him where he would receive instruction in the Church of his baptism. The communicants of any religious faith or denomination are eager to add another to their number. Under the record the conclusion is incontrovertible that the petitioner never intended to rear the boy in the Catholic religion. She knew the desire and intention of Richard's father that the boy's religious training should continue as it had been. She had the stipulation and decree prepared to plainly so provide. There is no mistaking the clear import of these writings. She was given the care, custody and control of Richard on condition that he "be reared in the Roman Catholic Religion."

There is no question nor controversy that contempt of court must be established by clear, convincing and satisfactory evidence. This court has uniformly so held. Stein v. Municipal Court of Sioux City, 242 Iowa 465, 469, 470, 46 N.W.2d 721; Burtch v. Zeuch, 200 Iowa 49, 52, 202 N.W. 542, 39 A.L.R. 1349; Battani v. Grund, 244 Iowa 623, 631, 56 N.W.2d 166; Critelli v. Tidrick, 244 Iowa 462, 471, 472, 56 N.W.2d 159; Watson v. Charlton, 243 Iowa 80, 92, 50 N.W.2d 605; Jones v. Levis, 240 Iowa 602, 606, 35 N.W.2d 891, 36 N.W.2d 756. It is clear, beyond any reasonable question, that the evidence of petitioner's guilt is of the character and probative value required by our decisions. It is contended in her behalf that what she did was not willful. The record does not support this claim. What she did was not inadvertent, thoughtless, or unintentional. It was affirmative and determined action or her part with the fixed purpose of continuing it. She did not accompany Richard to the Congregational Sunday school, but engaged another to do so, and saw that he got there. It is a fair assumption that she never intended to comply with the decree which she presented to the court.

The majority opinion states that the divorce decree was rendered through error and inadvertence. After reference to "long, involved and alternative definitions"of the word "religion" in the dictionaries, it states: "But the word 'religion' is often confused in terms with cultus or form of worship of the different denominations [citing cases]. *So we think the parties and the court here confounded the terms. They referred to the 'Roman Catholic Religion' when they meant the cultus or forms of worship of that church; perhaps what was really intended was that the child should be reared in the Christian religion in conformity to the forms, discipline, organization and dogma of the Roman Catholic Church. If nothing more than the Christian religion was intended, rearing in any Christian church would satisfy the requirements of the decree; * * *.*" (Italics mine.) The majority opinion goes far afield in the foregoing tenuous reasons it urges. There is no sound or reasonable support for them in the record. I am sure that the word "cultus" never entered the minds of the parties. The word does not appear where words are defined in

Webster's New International Dictionary. In the footnote among obsolete words it is defined as "cultivation, culture, cult." In the Latin language it had various meanings.

The majority opinion also states: "The decree itself does not specify who shall rear the child in the stated religion. * * * The decree itself is silent as to whose duty it was to do these things." The clear and definite language of Item I of the decree is: "That the care, custody and control of Richard R. Lynch shall be awarded to the Plaintiff and it is provided that such child shall be reared in the Roman Catholic Religion and that the Defendant shall *have the* right of visitation at all reasonable hours * * *." (Italics mine.) No more complete refutation of the statement in the majority opinion is required than the words of the decree. Plaintiff had full control of the child and defendant had only the right of visitation.

II. The problem of the religious faith in which minor children shall be reared is one with which courts are frequently confronted in matters involving their custody or adoption. These situations must be met and cannot be avoided. This court has recognized the problem. In Winter v. Winter, 184 Iowa 85, 87, 166 N.W. 274, 275, a habeas corpus case, the court said: "Much evidence was introduced on both sides, pro and con, as to this father's fitness * * * for his parental privilege, having due regard to the best interests of the child. It is pathetic enough that differences of religious faith is a strong stimulus to the zeal of contending affections; the plaintiff and the deceased mother being Protestant, and the defendant and his sisters being Catholic. The issue of the contest, therefore, will determine the faith in which the child will be reared. We cannot, of course, be guided or influenced by this difference of religious views, further than to recognize that it emphasizes somewhat the right of the parent to have the child reared in his own religious faith, notwithstanding that the deceased mother desired it otherwise."

Another case is In re Guardianship of Waite, 190 Iowa 182, 187, 180 N.W. 159, 161, in which the parents had died and there was a controversy as to the guardianship of the minor children between the mother of the father and a brother of the mother. The court said: "Undoubtedly the religious faith of the parents is a matter for consideration, though not controlling. See Winter

v. Winter, 184 Iowa 85. The courts will not arrogate to themselves the right to determine what religion, if Christian, will prove most beneficial to a child of tender years, but will take into consideration church affiliations of relatives with whom the child is likely to associate, only as bearing on his probable welfare in the future. The parents of these children were of the Catholic faith, as is Helmer [brother of the mother]. Mrs. Waite [mother of the father] has a preference for that denomination, though not a communicant. Mrs. Stoltenburg is a Congregationalist, and Mrs. Spiers is a member of the Presbyterian Church. We are not inclined to discuss critically nor to compare the tenets of faith approved by any denomination. It is thought sufficient if the children be taught the fundamental principles of Christianity, and reared according to its teachings. This is assured, whatever our conclusion."

The statutes of the State recognize in the chapter which deals with Child Welfare that the official agencies of the State in the placement of children for adoption "shall take into consideration the religious faith or affiliations of the child or its parents." Code section 235.3, paragraph 3. This is a declaration of policy. We find no decisions that such statutes violate any Constitutional provisions.

There is no difference of opinion among the courts that parents have the exclusive right to determine and rear their children in any religion or religious faith which they choose without interference by the courts, if the teaching is not contrary to public policy. Certainly this is true of any Christian faith or religion. Such right is "protected", and not "prohibited" by the Constitutional provisions. This is conceded in the brief of the Amicus Curiae, which states: "It is hardly open to question that the right of parents to rear their children in the faith of their choice is protected by the First and Fourteenth Amendments to the Federal Constitution."

The provision in the Iowa Constitution is in substantially the same language as that of the First Amendment to the Federal Constitution.

Mr. and Mrs. Lynch were husband and wife, with equal rights as to the custody and rearing of the children, when they executed the stipulation and approved the decree. They had a

right, in the settlement of their marital difficulties to agree upon the religious upbringing of their children. The stipulation and decree presented no controversy to the court other than the determination of the alleged grounds of divorce. If religious affiliations may be considered in relation to the custody of the children, without offending Constitutional provisions, there should be no legal objection to incorporating in a divorce decree which awards custody, a provision which both parents have agreed upon and asked the court to include in the decree awarding custody.

It is my conclusion that the decretal order awarding custody of Richard to his mother, with the condition that he be reared in the Roman Catholic religion, violates none of the Constitutional provisions specified. Courts avoid the determination of controversies involving religious doctrines, tenets or principles. But no such controversy was before the divorce court nor the respondent. In fact, there was no controversy, factual or otherwise. It was an admitted and conceded fact in the court of the respondent that the petitioner was not rearing Richard in the Catholic faith, in violation of the decree. She thereby subjected herself to punishment for the contempt.

The divorce decree was entered in accord with a stipulation of the parties and they are estopped from predicating error as to any of its provisions. It is obvious that no party can appeal from a consent decree or judgment, not void for lack of jurisdiction of the parties or the subject matter, nor accept the benefits of such decree, and challenge such parts thereof as may be unsatisfactory. Hughes v. Feeter, 23 Iowa 547, 548; Stever v. Heald, 61 Iowa 709, 710, 17 N.W. 145; Root v. Heil, 78 Iowa 436, 43 N.W. 278; Van Gorden v. Schuller, 192 Iowa 853, 185 N.W. 604; Truitt v. Mackaman, 162 Iowa 253, 144 N.W. 22; Lytle Investment Co. v. McMorris, 189 Iowa 1355, 1362, 179 N.W. 871.

The defense which petitioner makes against the contempt proceedings is a collateral attack against them. She has instituted no proceeding to modify the divorce decree. It is a familiar rule that in contempt proceedings, the contemnor cannot collaterally attack the validity of the proceedings out of which the contempt arises. Geneva v. Thompson, Judge, 200 Iowa 1173, 1175, 1176, 206 N.W. 132.

In Pure Milk Assn. v. Wagner, 363 Ill. 316, 320, 2 N.E.2d 288, 289, defendants were found guilty of violating an injunction. Though not raising the question below, they argued that the order was unconstitutional. The court held: "No constitutional issues can now be raised as a defense to the proceeding in contempt. The court was a court of general jurisdiction and had the authority to enter a decree for a permanent injunction. The question as to whether the decree was correct or incorrect did not control the jurisdiction of the court to pronounce a particular decree, regardless of whether the decree was proper or improper. If it was the claim then that the decree was based on an unconstitutional law, that point should have been raised by a proceeding to review the original decree. The defendants were not justified in ignoring the decree, inasmuch as the court had jurisdiction of the parties to the proceeding and the subject matter of the proceeding in which the original decree making the injunction permanent was entered."

Other decisions, that when an order or decree becomes res judicata it is not subject to attack in the contempt proceedings, are Howat v. Kansas, supra, 258 U. S. 181, 42 S. Ct. 277, 66 L. Ed. 550; Swift & Co. v. United States, 276 U. S. 311, 48 S. Ct. 311, 72 L. Ed. 587; United States v. United Mine Workers of America, 330 U. S. 258, 67 S. Ct. 677, 91 L. Ed. 884; Maggio v. Zeitz, 333 U. S. 56, 69, 68 S. Ct. 401, 408, 92 L. Ed. 476, 487, in which the court said: "* * * It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy."

Petitioner made no claim in her petition for the writ of certiorari that the divorce decree conflicted with any constitutional provision. Parents have a constitutional right to rear their minor children in accord with the tenets of any religion they choose. Pierce v. Society of Sisters, 268 U. S. 510, 535, 45 S. Ct. 571, 69 L. Ed. 1070, 1078, 39 A. L. R. 468. Courts may decide the property or contract rights of religious societies to the same extent as those of other like organizations or charitable associations. Watson v. Jones, 80 U. S. (13 Wall.) 679, 20 L. Ed. 666.

In Zorach v. Clauson, 343 U. S. 306, 312, 72 S. Ct. 679, 683, 96 L. Ed. 954, 961, the court said: "The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise, the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: 'God save the United States and this Honorable Court'."

As said by this court in Burtch v. Zeuch, supra, 200 Iowa 49, 56, 202 N.W. 542, 544, 39 A. L. R. 1349, 1354: "It is elementary that disobedience of an order or process made by a court within its jurisdiction and power is a contempt, although the order or process may be irregular or irregularly issued."

III. If any relief was available to the petitioner, without a change in circumstances, for a modification of the divorce decree, she should have made application therefor, but as it is the stipulation and decree stand as she had them phrased. In State v. Baldwin, 57 Iowa 266, 270, 271, 10 N.W. 645, 647, a certiorari proceeding against the trustees of one church organization for violating a court order, their defense was that they could not comply with the order because the articles of their church's discipline required the consent of two thirds of the church membership. In affirming the action of the court in punishing the trustees for contempt, this court said:

"If these articles of discipline in any way qualify the right

of the trustees to control the use of the house [church] they should have been presented to the court in the injunction proceeding, and insisted upon as a reason why the order entered in that proceeding should not have been made.

"If they were called to the attention of the court in that proceeding, and notwithstanding the court erroneously ordered the trustees to do what is beyond their power, the order may, upon proper proceedings be reversed. But the order of the court, even if erroneous, was not void. The court had jurisdiction of the parties and of the subject matter, and its adjudication cannot be disregarded with impunity. So long as it remains unreversed it must be obeyed. There would be an end of all subordination and social order, if parties could disregard judicial orders, and when proceeded against for contempt, call in question the correctness of the order itself. In such a proceeding the only legitimate inquiry is, did the court have jurisdiction, and did it make an order which has been violated?"

Courts are charged with the duty of guarding their proceedings against everything that interferes or tends to interfere with the administration of justice. Murphy v. Wright, Judge, 167 Iowa 75, 80, 148 N.W. 985, Critelli v. Tidrick, Judge, supra, 244 Iowa 462, 472.

As stated in United Packing House Workers v. Boynton, Judge, 240 Iowa 212, 223, 35 N.W.2d 881, 888: "The object [of contempt-of-court proceedings] is not to punish an offense but to compel obedience and respect for the order of the court. State v. Baker, 222 Iowa 903, 270 N.W. 359. The keystone of this government has been, is, and must be, respect for and obedience to orders of the courts."

While review in this contempt-of-court proceedings is not a trial de novo, we are not bound by the findings of fact of the respondent, though they are entitled to much weight. Watson v. Charlton, 243 Iowa 80, 92; Critelli v. Tidrick, 244 Iowa 462, 472, Battani v. Grund, 244 Iowa 623, 631, and Jones v. Levis, 240 Iowa 602, 607, 608, all supra. I am satisfied that the findings of the respondent have full support in the record.

It is also my conclusion that none of the Constitutional provisions, referred to in the majority opinion, is violated by the

challenged decree, and that the authorities relied on therein are not applicable because of the differences in their facts, and the factual situation in the case at bar. In none of them was the decree violated prepared and presented to the respective courts by the contemnor.

One of the reasons for the conclusion of the majority is thus stated: "* * * keeping in mind that we have before us a contempt proceeding in which the punishment will in all probability be a fine or imprisonment of unknown but real severity, we can only conclude that that part of the decree involved should be held void for uncertainty and indefiniteness." I am not in agreement with the propriety or soundness of such assumption respecting what penalty the respondent might have ordered, when there is no basis for it in the record.

It is my conclusion that neither the decree nor the portion of it attacked is void for uncertainty or indefiniteness.

I would annul the writ and dismiss the petition.

GARFIELD, OLIVER and SMITH, JJ., join in this dissent.