HARVEY H. PHILLIPS, petitioner, v. DISTRICT COURT OF HARDIN COUNTY, IOWA, respondent.

No. 50137.

(Reported in 106 N.W.2d 68)

November 15, 1960.

Haupert, Robertson & Johnson, of Marshalltown, for petitioner.

Lundy, Butler & Wilson, of Eldora, for respondent.

THOMPSON, J.—The petitioner herein was divorced from Dorothy Phillips by a decree of the Hardin District Court, entered on January 9, 1960. The parties are the parents of three sons: John, age 13; Harvey II, age 11, and Robert, age 9. The divorce decree gave the custody of the two older boys to the petitioner, and of Robert to his mother, Dorothy. The decree contained this provision: "That the children born as a result of this marriage, whether in the custody of plaintiff or

defendant, be not removed from the State of Iowa without order of the Court allowing same by proper application made, but not ex parte."

In prior years the plaintiff had often taken the three boys to the State of Minnesota on fishing trips and upon occasion to Chicago, in the State of Illinois, to witness major league baseball games. The petitioner was the only witness called upon the hearing held to determine his guilt or innocence of the charge of contempt and his testimony is the only evidence in the case.

It appears without dispute that shortly before May 14, 1960, the petitioner, who was engaged in the operation of a garage and the sale of motor vehicles in the City of Marshalltown, made a sale of a Studebaker truck, which he did not have in stock. He therefore planned to go to South Bend, Indiana, to pick up the truck and drive it to Marshalltown; and he took the opportunity to take the two boys who were in his custody with him, chiefly, apparently, so that they could attend a "double-header", or two baseball games played on the same afternoon, at Wrigley Field in Chicago. He did not secure permission of the court to take the boys from the state. He did, however, attempt to call Dorothy Phillips, who lived in Eldora, to gain permission to take the youngest boy, known in the record as Bobby, also on the trip. However, he did not succeed in reaching Mrs. Phillips by telephone, and Bobby did not make the journey.

On May 14 the petitioner left Marshalltown with the two older boys, about 12:30 a.m. They caught a train at Newton about 3 a.m., arrived in Chicago about 8:30 a.m., and immediately left on another train for South Bend, which they reached at approximately noon. They picked up the truck and drove back to Chicago, arriving there about 5 p.m. They secured accommodations at a hotel near Wrigley Field, spent the night there, and the next morning the petitioner took the boys to Sunday school at a near-by church; then the party visited the Lincoln Park zoo, and in the afternoon attended the two baseball games. Leaving Chicago about 5 p.m., in the truck, they arrived at Marshalltown between midnight and 1 a.m. on the

morning of May 16. All told, the boys had been outside the State of Iowa for perhaps forty hours.

The next week the petitioner conferred with Dorothy Phillips about taking Bobby on a fishing trip to Minnesota, with the other boys. According to the record, Mrs. Phillips made no objection, but asked as to the time and place when the petitioner would pick him up. But during the visit Bobby discovered that the two older brothers had made the Chicago trip, and when Mrs. Phillips learned that fact the present proceeding was instituted. A citation alleging contempt was served upon the petitioner, a hearing was had, he was adjudged guilty of contempt and sentenced to serve 30 days in the Hardin County jail, with 25 days suspended so long as petitioner did not commit any further violations of the terms of the decree.

I. The petitioner testified that he did not intend to violate the decree, nor to defy the court. He said that he understood the word "removed" in the quoted portion of the decree to mean something in the nature of a permanent removal, and it did not occur to him that he was in any manner violating the decree by the short trip to South Bend and Chicago. His version of his conversation with his former wife indicates that neither of them thought a fishing trip to Minnesota would be in violation. It is true that later an application was made to the court for permission to take this trip; but this was after the citation for contempt was served, when petitioner was aware of Mrs. Phillips' attitude. In fact, while Mrs. Phillips, according to the record, did not indicate she thought any permission of court was necessary for the fishing trip to Minnesota, she did, upon discovering that the Chicago trip had already been made, decide to request punishment of the petitioner. The matter at this point has some unappealing overtones of vindictiveness.

It appears without dispute in the record that the quoted part of the divorce decree was inserted at the request of the petitioner, who thought there would otherwise be danger that the divorced wife might take Bobby to California to make her home there. What he had in mind was to prevent a permanent removal. This somewhat strengthens his contention that he had not thought of a short trip of less than two days outside the

state as being a violation. The court, however, said he had taken the boys from its jurisdiction and could not be heard to say he did not understand the terms of the decree, which the court thought sufficiently clear. ·

It is true when the terms of a decree or other court order are clear and unambiguous a contemnor will not be heard to say he did not understand it and did not intend to violate it. On the other hand, when the language of the decree or order is ambiguous and the alleged contemnor acts in apparent good faith and without intent to violate it he should not be held guilty. 17 C. J. S., Contempt, section 42, pages 54, 55; Carter v. Commonwealth, 96 Va. 791, 802, 32 S.E. 780, 45 L. R. A. 310. We have authority of our own to the same effect, which we shall consider later.

II. The exact meaning of the word "removed" as used in the decree is of controlling importance in the case at bar. We learn from Webster's New International Dictionary, Second Edition, that it has various definitions. "Remove", according to this authority, means "To change or shift the location, position, station, or residence of; to transfer, especially in order to re-establish;—usually with *to* and specified place; * * *." Specifically, it is said to mean "The transfer of one's business, or of one's domestic belongings, from one location or dwelling house to another; * * *."

It is true the word also has more temporary connotations, as "To move by lifting, pushing aside, taking away or off, or the like; to put aside, apart, or elsewhere; as, to remove one's shoes; * * *." But these various definitions serve only to empha-. size the patent ambiguity in the word when used in a decree or other order of court without any further indication as to which kind of removal was meant. The petitioner, when he requested and secured the insertion of the provision against removal in the decree, had in mind a permanent change of residence. There is no dispute in the record as to that. It serves to show the interpretation he put upon the word. It is true when the boys were taken outside the state they were beyond the jurisdiction of the Iowa courts. But this was done, as the record substantially shows, without the intent to violate any order of the court, and it resulted in no harm to anyone. Rather the boys had an

enjoyable trip and the good faith of the petitioner is shown by the fact that he at once returned them to Iowa. If the court meant to prohibit temporary removals such as this, it could and should have made its language so definite that no question of ambiguity and misunderstanding might arise.

Contempt proceedings are quasi-criminal and are commonly treated as criminal in nature even when they arise in civil actions. Lynch v. Uhlenhopp, 248 Iowa 68, 72, 78 N.W.2d 491, 494; 12 Am. Jur., Contempt, section 67, page 434. In the same case, page 72 of 248 Iowa, page 494 of 78 N.W.2d, we quoted with approval this language from Plummer v. Superior Court, 20 Cal.2d 158, 164, 124 P.2d 5, 8: " 'The rights of the parties under a mandatory judgment whereby they may be subjected to punishment as contemnors for a violation of its provisions, should not rest upon implication or conjecture, but the language declaring such rights or imposing burdens should be clear, specific and unequivocal so that the parties may not be misled thereby.' "

The question is discussed at length in Lynch v. Uhlenhopp, supra, and many authorities are cited in support of the proposition that a contempt proceeding may not be bottomed upon an uncertain or ambiguous clause in a decree or order, and it would serve no worth-while purpose to repeat them here. It is true the case was decided by a divided court; but the difference arose over the question whether the language of the decree there under consideration was in fact indefinite and uncertain. In the dissenting opinion it is said, at page 89 of 248 Iowa, page 504 of 78 N.W.2d: "I have no particular quarrel with the statement that contempt proceedings are somewhat quasi-criminal, nor with the authorities cited that the decretal or judicial order which the contemnor is charged with violating must be certain and definite." Both the majority and minority agreed with this principle.

We think the situation in the case at bar brings it squarely within the authority of Lynch v. Uhlenhopp. The varying definitions and meanings of the word "remove" left the portion of the decree which the petitioner is charged with violating indefinite, uncertain and ambiguous. His good faith abun-

dantly appears. We hold the court was in error in finding him guilty of contempt, and, of course, in imposing a sentence therefor.—Writ sustained.

All JUSTICES concur.