# IN THE SUPREME COURT OF IOWA

No. 13 / 05-0135

Filed December 7, 2007

IN THE MATTER OF THE ESTATE OF
GLENN W. WOODROFFE, Deceased

RANDOLPH W. WOODROFFE
and JANICE M. WOODROFFE,

    Appellants,

vs.

THE ESTATE OF GLENN W.
WOODROFFE, ELDA H. WOODROFFE,
JEANNE A. WOODROFFE, REGINALD
WOODROFFE, KERWIN WOODROFFE,
and ANITA L. ERICKSON,

    Appellees.

------------------------------------------------------------------------

THE ESTATE OF GLENN W.
WOODROFFE and RANDOLPH
WOODROFFE, a/k/a RANDY
WOODROFFE,

    Appellants,

vs.

KERWIN WOODROFFE, ANITA
ERICKSON, and THE UNBORN OR
ADOPTED CHILDREN OF GLENN
W. WOODROFFE,

    Appellees.

Appeal from the Iowa District Court for Lee County, James Q. Blomgren, Judge.

Plaintiffs appeal, and defendants cross-appeal, from the district court's adjudication resolving the parties' competing claims to real and personal property. **AFFIRMED.**

Robert S. Hatala of Crawford, Sullivan, Read & Roemerman, P.C., Cedar Rapids, for appellants.

William H. Napier of Napier, Wolf & Napier, Fort Madison, for appellee Elda H. Woodroffe.

John H. Smith of Smith, Kultala & Boddicker, LLP, Keokuk, for appellee Kerwin Woodroffe.

M. Carl McMurray, Keokuk, for appellee Estate of Glenn W. Woodroffe.

**HECHT, Justice.**

This case presents a saga covering three generations of the Woodroffe family. The family created a profitable sawmill business due in large part to the industry and hard work of Glenn Woodroffe. After about thirty years in the business, Glenn attempted during his lifetime to ensure the continuation of the family enterprise beyond his lifetime. By the time of his death in 2002, however, Glenn had failed to establish business and testamentary arrangements necessary to avoid family conflicts over the future ownership of the mill and related assets. Those conflicts survived Glenn and fostered this litigation.

## I. Background Facts and Proceedings.

We find the following facts from the record. Glenn started the family business with a portable sawmill. He incorporated the company, Glenn Woodroffe Sawmill, Inc. (GWSM), in 1957.[1] Although he started the company with a portable mill, Glenn eventually had the opportunity to locate the business on real estate located in rural Lee County. In 1959, Charles Woodroffe, Glenn's father, conveyed that real estate to Glenn, for life, with the remainder interest in equal shares to Glenn's children living at the time of Glenn's death.

Glenn and his wife, Elda, raised five children: Randolph, Jeanne, Reginald, Kerwin, and Anita. Randolph, the eldest child, was active in the family business from an early age. After achieving a college degree in industrial engineering, he returned to work full-time at the mill in 1974. In addition to his long hours of work in the day-to-day operations of the mill, Randolph drove the truck that delivered to customers loads of pallets manufactured by GWSM.

---

[1] The articles of incorporation identified Glenn as the sole officer and director of the company.

The other Woodroffe family members were involved to a lesser degree in the day-to-day operations of the company. Elda was at times identified in GWSM records as the company's corporate secretary, but she was unable at trial to recall the duration of her service as an officer. Her role in the company's operations was clearly insubstantial compared to Glenn's and Randolph's. Although Jeanne, Reginald, Kerwin, and Anita performed tasks around the mill during their youth, the record does not provide much detail as to their involvement in the operation.

Although Glenn worked incredibly long hours at the mill and devoted great energy to the business, he was less than fastidious about compliance with corporate formalities. Although corporate tax returns consistently identified Glenn as the sole owner of the company, no stock certificates were ever issued by the company. No records of an initial organizational meeting or subsequent annual corporate meetings were maintained. No assets were transferred to GWSM to capitalize the company when it was organized. Little, if any, effort was made to segregate the company's assets from the Woodroffe family's assets. Although almost all of the income-producing machinery, equipment, and building improvements were purchased with funds from GWSM's bank account, tax deductions for the depreciation of those assets were taken on the personal tax returns of Glenn and Elda, and Randolph and his wife, Janice.[2] Although GWSM paid rent to those individuals for the use of such assets, no corporate records evidence the company ever transferred ownership of the assets to the family members.[3]

---

[2]This was consistently true until 1994 when the company's tax return claimed some depreciation expense.

[3]Glenn and Randolph received rent payments in lieu of W-2 earnings from GWSM to avoid tax withholding. Randolph also received income from GWSM for the trucking services he provided for the enterprise.

Organized under Iowa Code chapter 491 (1954), the corporate existence of GWSM was to terminate after twenty years unless renewed. In 1976, the Secretary of State notified Glenn and his attorneys that the corporation's existence would expire on January 14, 1977, if a certificate of renewal and renewed articles of incorporation were not filed. Although Glenn delivered the notice of impending expiration to his attorney who prepared a draft of the necessary renewal documents, there is no evidence that the documents were ever signed by Glenn and forwarded to the Secretary of State. Consequently, the corporate existence of GWSM expired on January 14, 1977. No annual corporate reports were filed by GWSM after 1976.

Although the de jure existence of GWSM expired in January of 1977, the sawmill business's operations continued as before. Corporate income tax returns were filed under the name and tax identification number of GWSM; machinery and equipment were purchased and building improvements were constructed with funds from the GWSM bank account; and workers' compensation and unemployment claims lodged against GWSM were defended as though the corporation still existed.

By the late 1980s, Glenn had begun thinking about how ownership of the business could be transferred, upon his death, to Randolph. He realized he only held a life estate, and that Randolph's siblings owned a four-fifths remainder interest, in the Lee County real estate upon which the machinery, equipment, and extensive building improvements used by the business, and a home built for Randolph and his wife, Janice, were situated.[4] Because Glenn and Randolph believed it was economically infeasible to move the mill improvements and the home to another location,

---

[4] The funds used to pay for the home were derived from mill revenues, and much of the labor was performed by mill employees, including Randolph.

Randolph sought to acquire his siblings' remainder interests. In furtherance of this objective, an appraisal of the real estate was undertaken in 1988.

The appraiser was specifically instructed to value the real estate assuming the existence of no mill or residential improvements. The resulting valuation of $42,500 was used by Randolph as the basis for his offers to purchase the remainder interests of his siblings. Although Reginald and Jeanne each conveyed their remainder interests to Randolph for $10,000, Kerwin and Anita did not. Unable to amicably complete the consolidation of the ownership of all of the remainder interests in Randolph, Glenn and Randolph filed a partition action in July of 1991 naming Kerwin and Anita as respondents. In their petition, Glenn and Randolph alleged they had made substantial improvements to the property in good faith; and they requested the court to order the sale of the property, and to award to them the value of the improvements from the sale proceeds.

On August 5, 1992, a consent decree was entered by the district court. It noted the parties had reached an agreement to (1) sell the Lee County real estate at public auction, (2) allocate to Glenn and Randolph from the sale proceeds "the enhanced value due to improvements made to the land by [them] in good faith," and (3) deposit the balance of the net proceeds in trust for the benefit of Glenn and the remaindermen. To ascertain the "enhanced value" occasioned by the improvements, the parties agreed and the court decreed that two appraisals of the property be undertaken by a specified appraiser: one including the value of the improvements made by Glenn and Randolph; and another disregarding the value of those improvements.

The appraisals contemplated in the August 5 order were not undertaken, however, and the public auction was not held. The petitioners

filed an application on August 28, 1992, alleging the appraiser identified in the August 5 order believed he was unqualified to conduct the appraisals, and asserting there was "an affordable and alternate procedure" that was likely "to produce greater partition proceeds."

On October 22, 1992, a new order was entered by the court confirming yet another agreement to resolve the parties' controversy. This order contemplated that the property would be divided by the parties into five parcels. One of these parcels identified as "Tract A" was "to include the sawmill, the house in which Randolph Woodroffe resides, and all other physical improvements to the land in question." The other four parcels, denominated "tracts 1, 2, 3, and 4," and consisting of essentially unimproved land, were to be sold at a private auction at which only the parties could bid. The average price per acre obtained at the auction for tracts 1, 2, 3, and 4 would be the price that Randolph would pay for Tract A. Glenn's life estate was "not to be affected" by the partition agreement and sale.

The auction was never held, and Glenn and Randolph continued to operate GWSM just as they had before. Kerwin, who had no interest in operating the sawmill, farmed rent-free the unimproved portions of the Lee County real estate. Glenn generally disapproved of Kerwin's farming practices, and the relationship between Glenn and Kerwin was strained at best.

GWSM owned a wooded tract of real estate in Des Moines County. On September 25, 2000, purporting to act as the president of GWSM, Glenn executed a warranty deed conveying this property to Randolph and Janice. In 2001, a bank requested documentary evidence of the corporate existence of GWSM. Glenn's counsel contacted the Secretary of State and discovered the company's corporate charter had expired in 1977. Having learned that

the name "Glenn Woodroffe Sawmill, Inc." was still available, Randolph caused new articles of incorporation for a corporation with that name to be filed in July of 2001. The new articles designated Randolph as the incorporator, registered agent, and sole director of GWSM.[5]

During his last illness, Glenn contacted his attorney and discussed the preparation of a will. Elda subsequently typed and Glenn signed a last will and testament on January 18, 2002. The will, in relevant part, named Elda as executor and bequeathed property to Elda and Randolph:

> I give all of my household furnishings, articles of personal use, Certificates of Deposit and automobiles for non-business use to my wife Elda. Also, all machinery, equipment and inventory owned by me at the time of my death, I leave to my wife Elda.

> As sole owner of the Glenn Woodroffe Sawmill, Inc. I give all my stock in that business or corporation to my son Randolph W. Woodroffe, who may continue the business after my death.

The will did not include a residuary clause.

Glenn died on April 22, 2002. On July 24, 2002, the district court admitted Glenn's last will and testament to probate. On January 27, 2003, Elda filed a probate report and inventory listing the Des Moines County real estate, the home in which Randolph and Janice lived, the buildings, machinery, and equipment used in the sawmill operation, and the sawmill inventory among the assets of Glenn's estate.

On May 8, 2003, Randolph filed an application requesting the appointment of a referee to assist with enforcement of the October 1992 order. Elda resisted the application, contending she had an interest in the improvements on the property and was not bound by the 1992 order as she was not a party to the partition action in which it was entered. Kerwin also resisted the appointment of a referee and asserted the boundaries to tracts

---

[5] Randolph handled the incorporation of GWSM in July of 2001 because Glenn was then in poor health. It is undisputed that Glenn was the sole owner of the newly-incorporated GWSM.

A, 1, 2, 3, and 4 had never been agreed to. Kerwin further contended the sawmill improvements were assets of Glenn's estate because they were not part of the property subject to the private auction contemplated in the October 1992 order. The district court denied Randolph's application for the appointment of a receiver because the matter involved "too many disputes and questions [that] must be resolved" before an auction could be held.

Randolph and Janice filed a petition for declaratory judgment on October 20, 2003, requesting the court to declare: (1) the Des Moines County property[6] is not an asset of Glenn's estate because Glenn executed a deed conveying the land from Glenn Woodroffe Sawmill, Inc. to Randolph and Janice on September 25, 2000; (2) the dwelling in which Randolph and Janice reside and the improvements used in the sawmill operation and located on the Lee County property are not assets of Glenn's estate because they are permanently affixed to "Tract A" which Randolph is entitled to acquire by private auction under the October 1992 order; and (3) the sawmill machinery, equipment, and inventory are not assets of Glenn's estate because they were owned by GWSM at the time of Glenn's death, and were bequeathed to Randolph as a consequence of Glenn's bequest of the GWSM stock. Elda and Kerwin filed separate answers substantially denying the allegations and claiming the October 1992 order is unenforceable.[7]

---

[6]The parties agree Janice's only interest in this litigation is her alleged entitlement to the Des Moines County property.

[7] Elda contended the order is unenforceable as to her because she was not a party to the partition action. Kerwin challenged the enforceability of the order because it contemplated the private auction and partition would occur only if the parties reached an agreement as to the boundaries of the several tracts identified in the order; and because the parties were unable to reach such an agreement, the contemplated partition was aborted and cannot be completed. Anita, Reginald, and Jeanne defaulted and are not parties to this appeal.

Because of the close connection between the legal consequences of the October 1992 order filed in the partition action and the appropriate disposition in the declaratory judgment action filed within Glenn's probate, the matters were consolidated for trial. During the trial, Randolph and Janice offered in evidence exhibits 23, 24, 25, 26, and 26A, consisting of typewritten documents allegedly authored by Glenn.[8] Randolph and Janice claimed the documents evidenced Glenn's testamentary intent to ensure that Randolph would receive Tract A and the GWSM machinery, equipment, and inventory. The district court sustained Elda's hearsay objections and the exhibits were not received in evidence.

On November 15, 2004, the district court filed its ruling holding the Des Moines County real estate is an asset of Glenn's Estate. The court reasoned that the attempted conveyance of that property from GWSM to Randolph and Janice failed because GWSM's corporate existence expired in January 1977, before the deed was drawn and delivered. The court further concluded the sawmill machinery, equipment, and inventory listed on the probate inventory are also assets of the estate because they were owned by Glenn at the time of his death. The court concluded, however, that the improvements (buildings used in the sawmill operation and the residence in which Randolph and Janice reside) that are permanently affixed to the Lee County real estate are not assets of the estate because their disposition is controlled by the October 1992 order in the partition action.

Randolph, Janice, and Kerwin filed motions to enlarge or amend the district court's findings, conclusions, and ruling. Randolph and Janice urged the court to (1) rule on their claim that the deed to the Des Moines County real estate should be reformed; (2) conclude the business inventory

---

[8] Although the documents were not signed by Glenn, the proponents of the exhibits did offer evidence tending to prove the exhibits, which were found after Glenn's death in the GWSM business office, were typed on the typewriter commonly used by Glenn.

is an asset of GWSM, and not an asset of the estate; and (3) address the question whether certain grain bins are located on Tract A, and whether their disposition is controlled by the October 1992 order. Kerwin urged the district court to amend its conclusion that the disposition of the improvements located on Tract A must be controlled by the October 1992 order, and joined in the post-trial request of Randolph and Janice that the court should decide the dispute as to the ownership of the grain bins. In its ruling on the respective motions to enlarge or amend the November 15, 2004 findings, conclusions, and ruling, the district court held the deed from Woodroffe Sawmill, Inc. to Randolph and Janice cannot be reformed because any mistake of the parties to the deed was a mistake in the formation of the transaction, not in its expression. The district court also denied relief on the other aspects of the post-trial motions, reasoning that (1) the October 1992 order should be enforced because it accurately memorialized the understanding and intent of the parties to permit Randolph to purchase Tract A which included the improvements permanently affixed to it; (2) the inventory was owned by Glenn at the time of his death because GWSM's corporate existence expired in 1977, and the inventory was never transferred from Glenn to the new corporation formed in 2001; and (3) the evidence supports the court's finding that the grain bins were purchased by Glenn, not by Kerwin, and placed on Tract A, the disposition of which was adjudicated in the October 1992 order.

Randolph and Janice appeal from the district court's determination that the Des Moines County property and the sawmill machinery, equipment, and inventory listed in the probate inventory are assets of the estate.[9] Kerwin and Elda cross-appeal from the court's conclusion that the

---

[9]The parties agree Janice's only interest in this litigation is her alleged entitlement to the Des Moines County property.

disposition of the improvements located on Tract A is controlled by the October 1992 order.

**II.     Scope of Review.**

Partition actions are equitable actions which we review de novo.  *See* Iowa R. Civ. P. 1.1201(1).  The declaratory judgment action brought in Glenn's estate is a matter "tried by the probate court as a proceeding in equity," Iowa Code § 633.33 (2007), and our review in such cases is de novo.  Iowa R. App. P. 6.4.  Although the district court made several rulings on evidentiary objections, a procedure typically followed in actions at law, "the pleadings, relief sought, and nature of the case" lead us to conclude the proceedings in the district court were equitable proceedings.  *Passehl Estate v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006) (noting that while a court's rulings on evidentiary objections is an important test of whether an action was tried in law or equity, it is not dispositive).  All of the parties agree our standard of review is de novo.

**III.    Analysis.**

**A.     Machinery, Equipment, and Inventory.**  Randolph contends the district court erred in holding the sawmill machinery, equipment, and inventory listed on the estate's probate inventory were owned by Glenn at the time of his death.  Randolph alleges those assets were, at the time of Glenn's death, assets of GWSM, and that they follow the GWSM stock bequeathed to Randolph.  Notwithstanding the expiration of the corporation's de jure existence in 1977, Randolph contends GWSM lived on for purposes relevant to the case as a de facto corporation.  In the alternative, he contends GWSM's corporate existence should be deemed to extend beyond the expiration of its de jure existence under the doctrine of corporation by estoppel.  Elda and Kerwin contend the machinery, equipment and inventory were properly listed in the probate inventory as

assets of the estate because, upon the termination of the corporation's existence in 1977, their ownership passed to Glenn who owned them at the time of his death.

For reasons discussed below, we conclude the only type of corporation Iowa law recognizes is one created pursuant to law—a de jure corporation. Consequently, GWSM's existence as a corporate entity ended in 1977 when the company failed to file a certificate of renewal and renewal of the articles of incorporation. The inventory, machinery and equipment listed on the estate's probate inventory were therefore owned by Glenn at the time of his death, and they pass to Elda under Glenn's will.

At common law, once a de jure corporation's term of existence ended pursuant to its charter, it could not continue to exist as a de facto corporation or corporation by estoppel. *See M. H. McCarthy Co. v. Dubuque Dist. Ct.*, 201 Iowa 912, 916, 208 N.W. 505, 507–08 (1926) (holding a corporation with an expired charter could only continue to act for purposes of winding up business); *accord In re Booth's Drug Store*, 19 F. Supp. 95, 96 (W. D. Va. 1937) ("The doctrine of the common law was that upon expiration of its charter, a corporation at once lost its identity and its powers; its life was instantly terminated."); *Merges v. Altenbrand*, 123 P. 21, 22 (Mont. 1912) (holding a corporation failing to follow statutory steps for continued existence was dissolved); 19 Am. Jur. 2d *Corporations* § 2352, at 457 (2007) ("The general rule is that after the expiration of the period of existence specified in its charter, a corporation is ipso facto dissolved and no longer has any existence at all, either de jure or de facto." (citing *Eagle Pass Realty Co. v. Esparza*, 474 S.W.2d 624, 625 (Tex. Civ. App. 1971))). The legislature did not repeal this common law rule through its enactment in 1989 of the Iowa Business Corporation Act (IBCA). *See Atwood v. Vilsack*, 725 N.W.2d 641, 644–45 (Iowa 2006) ("The common law may be repealed by implication

in a statute that plainly expresses the legislature's intent to do so." (citing *Iowa Civil Liberties Union v. Critelli,* 244 N.W.2d 564, 568 (Iowa 1976); *Wilson v. Iowa City,* 165 N.W.2d 813, 822 (Iowa 1969))). Rather, the IBCA plainly evidences a legislative judgment that the only type of corporation that may exist in Iowa is a de jure corporation.

First, the IBCA states, "Unless a delayed or effective date or time is specified, the corporate existence begins when the articles of incorporation are filed." Iowa Code § 490.203(1); *see also* 5 Matthew G. Doré, *Iowa Practice Series, Business Corporations* § 16:9 (2007) (stating IBCA section 490.203 supersedes the de facto corporation and corporation by estoppel concepts). We acknowledge this provision does not speak directly to whether a de facto corporation or corporation by estoppel may exist after a de jure corporation has expired. It does, however, indicate de facto corporations and corporations by estoppel may not exist prior to the formation of a de jure corporation. The parties do not suggest any reason why, under the IBCA, the period prior to de jure incorporation should be treated differently than the period after the expiration of de jure incorporation.

Second, the IBCA provides for personal liability for transactions that occur in the absence of de jure incorporation: "All persons purporting to act as or on behalf of a corporation, knowing there was *no incorporation under this Act,* are jointly and severally liable for all liabilities created while so acting." Iowa Code § 490.204 (emphasis added); *see* 5 Doré, *Iowa Practice Series, Business Corporations* § 16:9 (stating IBCA section 490.204 supersedes the de facto corporation and corporation by estoppel concepts). Personal liability in the absence of the existence of a de jure corporation plainly implies neither a de facto corporation nor a corporation by estoppel is recognized in Iowa.

Our decision is influenced by the historical background of the 1984 Model Business Corporation Act (MBCA), upon which the IBCA is patterned. The MBCA drafters observe the de facto corporation and corporation by estoppel doctrines have been " 'widely criticized as being confusing, result-oriented, overlapping, and involving legal conceptualism that tended to hide the true basis for the decision.' " 5 Doré, *Iowa Practice Series, Business Corporations* § 16:9 (citing Model Bus. Corp. Act Ann. § 2.04, Historical Background (3d ed. 1985 & Supp.)). The drafters expressly state they intended to do away with the de facto corporation concept through provisions mirroring the IBCA provisions cited above. *Id.* (citing Model Bus. Corp. Act Ann. § 2.04, Historical Background (3d ed. 1985 & Supp.)).

Our decision that the IBCA reflects disfavor toward the doctrines of de facto corporation and corporation by estoppel is consistent with the approach of most other jurisdictions with statutes patterned after the MBCA. *See, e.g., Swindel v. Kelly,* 499 P.2d 291, 299 n.28 (Alaska 1972) ("The concept of de facto corporations has been increasingly disfavored, and Alaska is among the states whose corporation statutes are designed to eliminate the concept."); *Booker Custom Packing Co. v. Sallomi,* 716 P.2d 1061, 1063 (Ariz. Ct. App. 1986) (finding the Arizona Business Corporation Act was "inconsistent" with the defendant's claim that he should not be individually liable because the plaintiffs thought they were dealing with a corporation); *Robertson v. Levy*, 197 A.2d 443, 447 (D.C. 1964) (holding the Business Corporation Act of the District of Columbia "eliminate[s] the concepts of estoppel and de facto corporateness"); *Warthan v. Midwest Consol. Ins. Agencies, Inc.,* 450 N.W.2d 145, 148 (Minn. Ct. App. 1990) ("[T]he doctrine of de facto corporations is inapplicable in this state after enactment of [the Minnesota Business Corporation Act]."); *Smith v. Halliburton Co.,* 879 P.2d 1198, 1207 (N.M. Ct. App. 1994) (finding the New

Mexico Business Corporation Act was "intended to abolish the doctrine of de facto corporations"); *Timberline Equip. Co. v. Davenport*, 514 P.2d 1109, 1110–12 (Or. 1973) (finding, as a result of the Oregon Business Corporation Act, the doctrine of de facto corporations no longer exists in Oregon); *Mobridge Cmty. Indus. v. Toure, Ltd.*, 273 N.W.2d 128, 131 (S.D. 1978) (finding a South Dakota law "has the effect of negating the possibility of a de facto corporation"); *Thompson & Green Mach. Co. v. Music City Lumber Co.*, 683 S.W.2d 340, 344 (Tenn. Ct. App. 1984) ("We hold that the Tennessee General Assembly, by passage of the Tennessee General Corporations Act of 1968, abolished the concept of de facto incorporation in Tennessee."); *Miller v. Celebration Mining Co.*, 29 P.3d 1231, 1237 (Utah 2001) ("[T]he common law doctrine of de facto corporations was specifically preempted by [two Utah Business Corporation Act provisions] because of its inconsistent application."); *Equipto Div. Aurora Equip. Co. v. Yarmouth,* 950 P.2d 451, 456 (Wash. 1998) (concluding that the Washington Business and Corporation Act "abolish[ed]" the doctrines of de facto corporation and corporation by estoppel).

GWSM's articles of incorporation expressly contemplated that the corporation would "terminate" on January 9, 1977, if the corporation's existence was not renewed. The corporation did not continue to exist after the expiration of its de jure existence as a de facto corporation or under the doctrine of corporation by estoppel. The corporation's existence continued after the January 1977 expiration date only to the extent necessary to wind up its business. We next turn to the question of who succeeded to the ownership of GWSM's machinery, equipment, and inventory, when the corporation's existence expired.

GWSM's articles of incorporation filed in 1957 expressly provided for the distribution of assets to shareholders upon dissolution of the corporation:

> In the event of dissolution or winding up of the affairs of this corporation . . . the assets of the Corporation shall be first applied to the payment of the first preferred stock at par, with all unpaid accumulated dividends thereon and before any payment is made to the holders of the common stock. The remaining assets of the Corporation shall be paid to the holders of the common stock according to their respective shares.

Although GWSM never issued stock, the company's tax returns consistently identified Glenn as the company's sole "shareholder." In addition, it is undisputed in this case that Glenn was the sole owner of the company. Therefore, we conclude Glenn was the owner of the machinery, equipment, and inventory listed on the probate inventory.

Randolph next contends the new corporation organized by him in 2001 under the same name succeeded to the ownership of the expired corporation's assets. This contention, too, must fail because Randolph failed to establish that any of the assets owned by Glenn were transferred to the new corporation. Therefore, the machinery, equipment, and inventory listed on the estate's probate inventory were owned by Glenn at the time of his death.

Randolph contends that the district court's decision that the machinery, equipment, and inventory are assets of Glenn's estate is inconsistent with Glenn's clearly expressed intent. In support of this contention, Randolph points to a typewritten note from Glenn to his attorney expressing his testamentary intent that Randolph should receive all of the sawmill machinery except any machinery owned by Reginald. Randolph also points in this context to the language of an unsigned will drafted by Glenn's attorney after he received the typewritten note from

Glenn. Randolph's reliance upon Glenn's note and the unsigned will is unavailing, however, because those documents antedated the will executed by Glenn and admitted in probate. "It is well settled in this jurisdiction that if the language of the will is plain, certain and unambiguous, the intention of the testator must be ascertained from the will itself . . . ." *In re Thompson's Estate*, 164 N.W.2d 141, 146 (Iowa 1969). Because the will signed in 2002 is unambiguous, Glenn's intent must be ascertained from within its four corners. That will clearly bequeaths to Elda the machinery, equipment and inventory listed in the probate inventory.

**B.** **Des Moines County Property.** The timber land located in Des Moines County was conveyed to GWSM in 1957. Randolph and Janice contend the September 25, 2000 deed executed by Glenn as president of GWSM was a valid conveyance. Alternatively, they assert that if the deed does not constitute a valid conveyance, it should be reformed because the parties to the deed mistakenly believed GWSM existed when the deed was drawn and delivered. Elda and Kerwin contend the real estate is an asset of Glenn's estate because GWSM did not exist at the time of the attempted conveyance, and the deed is therefore void. Elda and Kerwin oppose reformation of the deed on the ground that the deed, if void, may not be reformed to relinquish Elda's rights under Iowa Code section 633.211 (2001). Alternatively, they contend the deed, if valid, was nonetheless subject to Elda's rights under section 633.211.

For the reasons explained in our discussion of the disposition of the sawmill machinery, equipment, and inventory, we conclude GWSM did not exist on September 25, 2000. A deed executed on behalf of a corporation that does not exist is void. *See N.H. Fire Ins. Co. v. Virgil & Frank's Locker Serv., Inc.*, 302 F.2d 780, 783 (8th Cir. 1962) ("A [corporate] deed, executed while the corporation has no legal existence, is a worthless thing.").

We now turn to Randolph and Janice's assertion that the parties made a mutual mistake regarding the existence of the corporation, and this mistake merits reformation of their deed. We decline to reform the deed because we lack authority to reform void contracts. *Casady v. Woodbury County,* 13 Iowa 113, 115 (1862) (refusing to "modify" a void contract, due to lack of authority to do so); *see also Springer v. Kuhns,* 571 N.W.2d 323, 329 (Neb. Ct. App. 1997) ("When the parties are asserting rights founded in an illegal and void contract, the court leaves the parties just where they placed themselves . . . ."); 66 Am. Jur. 2d *Reformation of Instruments* § 29, at 253 (2007) ("Neither a void contract nor a parol contract can be reformed."). Because GWSM did not exist at the time of the conveyance of the Des Moines County property, no two parties reached a mutual agreement with regard to the conveyance. We cannot reform the deed to correspond with the contracting parties' intentions when one of those parties did not even exist; to do so would constitute creation of a contract, not reformation of a contract.

As previously stated, when GWSM dissolved in 1977, Glenn, as the sole shareholder of that corporation, became the owner of the corporate assets. The Des Moines County property was therefore owned by Glenn in 2000 when the ill-fated conveyance was attempted, and at the time of his death. Accordingly, the real estate is an asset of Glenn's estate, and it is properly listed on the probate inventory.

**C.** **Sawmill Improvements.** Elda and Kerwin assert the district court erred in holding the disposition of the numerous sawmill buildings located on the Lee County property shall be controlled by the October 1992 consent ruling. They contend those improvements were not a subject of the ruling, and they should therefore pass to Elda as intestate property pursuant to Iowa Code section 633.211.

Resolution of this claim requires us to interpret the October 1992 consent ruling. Because a consent ruling is viewed as a contract, the rules of contract interpretation apply. *Fed. Land Bank of Omaha v. Bollin*, 408 N.W.2d 56, 60 (Iowa 1987) (citing *World Teacher Seminar, Inc. v. Iowa Dist. Ct.*, 406 N.W.2d 173, 176 (Iowa 1987)). The intent of the parties is controlling, and intent is to be determined from the language of the contract, when possible. *Id.* ("The objective is to ascertain the meaning and intention of the parties as expressed in the language used. It is the court's duty to give effect to the language of the contract in accordance with its plain and ordinary meaning and not make a new contract for the parties by arbitrary judicial construction."). Only if we find the contract ambiguous may we resort to extrinsic evidence to ascertain the contract's meaning. *See Clinton Physical Therapy Servs., P.C. v. John Deere*, 714 N.W.2d 603, 615–16 (Iowa 2006).

The language of the October 1992 consent decree plainly indicates the parties intended for the improvements to pass as part of Tract A to Randolph. The October 1992 decree states Tract A is to "include the sawmill, the house in which Randolph Woodroffe resides, and all other physical improvements to the land in question," and it also states that Randolph is to receive Tract A at a price determined by the average of the sale prices received for tracts 1, 2, 3, and 4. The district court found it reasonable to believe, and we find it highly probable, Glenn was willing to forgo any personal remuneration for the value of the improvements to achieve what was clearly his goal for the last fifteen years of his life: to assure that Randolph would succeed him as the owner of the sawmill business and the improvements used to generate its income. The October 1992 consent ruling not only advanced that goal, but it avoided the public auction of the property contemplated by the August 1992 ruling and

thereby assured Glenn's right to use of the sawmill property for the remainder of his lifetime.

Kerwin claims the October 1992 consent decree lacks the definiteness essential for validity because: (1) it states the parties must agree on tract boundaries, but the parties never agreed on these boundaries, and (2) it does not clearly state whether the August decree remains effective. "[A] judgment must be certain and in intelligible form so the parties understand the adjudication." *Wolf v. Murrane*, 199 N.W.2d 90, 95 (Iowa 1972) (citations omitted). A judgment may be so indefinite and uncertain that it is void. *See Lynch v. Uhlenhopp*, 248 Iowa 68, 74–75, 78 N.W.2d 491, 495–96 (1956) (finding that a provision in a divorce decree was void and that an alleged violation of the provision was not contempt).

Whether or not the parties agreed on the precise metes and bounds of the tracts referred to in the October 1992 consent ruling, the decree clearly brings the improvements in question within the boundaries of Tract A. The decree states that Tract A is to include "the sawmill, the house in which Randolph Woodroffe resides, and all other physical improvements to the land in question" and provides Randolph will buy the tract at a price determined by a specific formula. We conclude the language of the ruling is sufficiently definite to constitute a valid, binding judgment with regard to the allocation of ownership of the improvements.

The October 1992 ruling was clearly intended to supersede the August 1992 ruling. This is in part clear because the two rulings contemplated vastly different solutions to the parties' conflicts. For example, the August ruling would have required appraisals of the property, while the October decree does not; the August ruling contemplated a public auction, but the October ruling mandates a private auction; and the August ruling would have required Glenn to convey his life estate to a purchaser,

but the October ruling states Glenn's life estate "will not be affected" by the private auction. Because of these differences, it would obviously be impossible for the parties to comply with and for the court to enforce both the August and October 1992 decrees.

Other evidence also amply supports our conclusion the parties intended for the October consent ruling to supersede the earlier ruling. The application that precipitated the October 1992 ruling states the parties viewed the August decree as "unworkable," due to their inability to locate a qualified appraiser. The application further states the parties desired an "*alternate* procedure [that] w[ould] likely produce greater partition sale proceeds." Greg Johnson, Randolph and Glenn's attorney in the partition action, testified the October decree was intended to supersede the earlier decree.

Kerwin asserts the parties to the October consent ruling agreed the improvements in question were not part of Tract A; instead, he claims the improvements were intended to remain "severed" from the property and to remain the personal property of Glenn. In support of this assertion, Kerwin argues: (1) the Iowa law of "implied license" suggests the improvements retained their character as personal property; (2) under *Cornell College v. Crain*, 211 Iowa 1343, 235 N.W. 731 (1931), the improvements retained their character as personal property; (3) all the parties to the partition action agreed that the improvements were to remain Glenn's separate property; and (4) Glenn, individually or through his business, paid for all of the improvements.

Kerwin's implied license argument need not be addressed because it was not made before or ruled upon by the district court. *See State v. Jefferson*, 574 N.W.2d 268, 278 (Iowa 1997) (observing that " 'issues must be presented to and passed upon by the district court before they can be

raised and decided on appeal' " (citing *State v. Eames,* 565 N.W.2d 323, 326 (Iowa 1997))). The remaining arguments lack merit in light of our interpretation of the October consent ruling. The consent ruling reflects the parties' intent for Tract A to include improvements. Regardless of whether Glenn paid for the improvements or the improvements could be classified as Glenn's personal property under *Crain,* Glenn could, and did, forgo any ownership interest he may have had in the improvements when he agreed to the terms of the October consent ruling.

The Lee County real estate and the improvements permanently attached to it pass to the remaindermen-children pursuant to the October ruling, not to Elda. The ruling requires the sale of Tract A, including the improvements located upon it, to Randolph. Elda, as Glenn's surviving spouse, has no interest in the life estate of Glenn under section 633.211, as Glenn's interest in the real estate was extinguished at the time of his death.

**D.** **Hearsay Rulings.** Randolph contends the district court erred in excluding exhibits 23, 24, 25, 26, and 26A, which were offered to prove Glenn's intent as to the disposition of his assets. He asserts the typewritten exhibits were admissible under Iowa Rules of Evidence 5.803(24) (residual hearsay exception) and 5.803(3) (then existing mental, emotional, or physical condition). The writings bear no signature, but Randolph claims they were authored by Glenn because they "sound like" something he would have written, and they appear to have been written on Glenn's typewriter. Some are dated, while others are not. One of the documents was found shredded in a wastebasket in the company's business office.

Even assuming these documents were admissible, the district court's ruling excluding them from evidence did not prejudice Randolph and Janice and no reversible error resulted from their exclusion. *See Crane v. Cedar Rapids & Iowa City Ry.,* 160 N.W.2d 838, 846 (Iowa 1968) (concluding

exclusion of evidence did not prejudice plaintiff). The exhibits in question would have no impact upon our reasoning or conclusions regarding the disposition of Glenn's assets. Because Glenn's will is unambiguous as to his intent regarding the disposition of the machinery, equipment, and inventory, we need not look beyond its express terms to discern his testamentary intent. *See In re Thompson's Estate*, 164 N.W.2d at 146 ("It is well settled in this jurisdiction that if the language of the will is plain, certain and unambiguous, the intention of the testator must be ascertained from the will itself . . . .").

**IV.  Conclusion.**

We conclude the corporate existence of GWSM expired in 1977. As a result, the machinery, equipment, and inventory of the sawmill business were owned by Glenn at the time of his death and are therefore properly included as assets of his estate. The deed of the Des Moines County property is void and cannot be reformed. Accordingly, that real estate is also an asset of Glenn's estate. Tract A, which is to be sold to Randolph pursuant to the October 1992 consent ruling, includes the improvements located on that property. The district court's exclusion of hearsay, if error, was harmless.

**AFFIRMED.**